## M & W GEAR COMPANY, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 834–68.  Filed March 2, 1970.

*Robert E. Johnson*, for the petitioner.
*Wayne Chertow*, for the respondent.

OPINION

*Issue 1*

Section 162 (a) (3) of the Internal Revenue Code of 1954 [8] provides for the deduction of—

(3) rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken *or is not taking title or in which he has no equity.* [Emphasis added.]

The issue confronting us here is whether petitioner's payments under the purported lease of January 22, 1963, are deductible as rental payments within the purview of the above statute. We hold that they are not; petitioner was acquiring an equity in the property and, as a natural consequence thereof, was planning on taking title to the property.

The question of whether purported rental payments are in substance payments of part of the purchase price is one of fact. We put it thusly in *Norman Baker Smith*, 51 T.C. 429, 438 (1968) :

We adhere to our view that the substance of the transaction will be considered and whether an amount paid under the designation of rental payment is a part of the purchase price of the property or is a rental payment, will be determined from the substance of the agreement in accordance with which the payment is made.

In the instant case petitioner agreed to buy and Ben Nation agreed to sell the Blairsville Farm for $358,000. Meiners, the president of petitioner, conferred with his tax adviser and expressed his desire to Ben Nation that the transaction be recast into the form of a lease with an option to purchase, so that petitioner could deduct its payments as rental expense. Ben testified that Meiners advised him that such a

---

[8] All section references are to the Internal Revenue Code of 1954 unless otherwise stated.

change would have no adverse tax effects on him. The first unexecuted option agreement provided that: "all monies received under the terms of said Lease will be applied on the purchase of this property * * *." The effect of this language is obvious, i.e., purported rental payments are used to reduce the purchase price. This is indicative of the acquisition of an equity in the property by those payments. See, e.g., *Rotorite Corporation* v. *Commissioner*, 117 F. 2d 245 (C.A. 7, 1941), reversing 40 B.T.A. 1304 (1939).

However, the documents were amended with the result that the lease, which was executed on January 22, 1963, provided that the option, contained therein, was not exercisable until the full term of the lease had run. This provision in conjunction with a low option price had a dual effect. Firstly, it guaranteed the seller five payments of $50,660 plus $173,707.40, on exercise, which in the aggregate totaled the fair market value of the property. And secondly, the low option price meant that petitioner's so-called rental payments would of necessity be credited towards the full purchase price.

We found as a fact that the fair rental value of the Blairsville Farm was at most $15 per acre. Petitioner paid "rent" of $34 per acre. This disparity indicates that petitioner was purchasing something of value in addition to the mere use of the property. Petitioner was building an equity and such payments, therefore, did not constitute rent. In *Chicago Stoker Corporation*, 14 T.C. 441, 445 (1950), we said:

If payments are large enough to exceed the depreciation and value of the property and thus give the payor an equity in the property, it is less of a distortion of income to regard the payments as purchase price and allow depreciation on the property than to offset the entire payment against the income of one year. * * *

Petitioner argues on brief that in arriving at a fair rental value of less than $34 per acre respondent failed to consider the effect of the soil bank which indeed paid Ben Nation $34 per acre. However, the payments made by the soil bank were only on account of 125 acres and there was no offering of evidence to indicate that the soil bank would have been willing to pay $34 per acre on the entire 1,490 acres, or for that matter, on any acreage above 125.

Petitioner argues that the fair market value of the Blairsville Farm was approximately $117 per acre; [9] and based on this figure the option

---

[9] At trial petitioner introduced evidence of sales of similar property near the Blairsville Farm. Such property, according to petitioner's witness, changed hands for from $90 to $100 per acre. While we recognize that such objective evidence may be preferable to the testimony of expert witnesses, we chose not to accept this valuation, because the circumstances surrounding these purported sales were not explicated. It may be that such sales were identical to the transaction involved herein, i.e., here petitioner has stated that the Blairsville Farm changed hands for $173,707.40.

price of $173,707.40,[10] agreed to, was reasonable. We give petitioner the benefit of the doubt when we find that the fair market value of the Blairsville Farm as of January 1963 was not less than $342,700.[11]

This disparity between the amount payable upon exercise of the option and the fair market value of the property bolsters our conclusion that the "rental" payments were used to reduce the purchase price; and petitioner was acquiring equity in the property, *D. M. Haggard*, 24 T.C. 1124 (1955), affd. 241 F.2d 288 (C.A. 9, 1956).

The relationship between the amount of the "rental" payments and the petitioner's contention as to the fair market value of the property is also instructive. Assuming that the fair market value of the farm was $173,707.40, then an annual rental of $50,660 would be approximately 29 percent of the fair market value. This seems an unreasonably high rent, particularly in view of the fact that 5 years' rent totally eclipses the purported purchase price. This is another factor indicating that petitioner was acquiring an equity in the property. See *Judson Mills*, 11 T.C. 25 (1948).

When petitioner's president, Elmo Meiners, was asked at trial why he preferred to pay some $253,300 in rent over a 5-year period as opposed to purchasing the property outright for approximately $173,707, he stated in essence that he did not want the petitioner to become obligated for such a large cash outlay and that in the event of the failure of petitioner's experimental work he could have terminated the lease. We note, however, that the lease contained no provision for cancellation without cause. And it appears that petitioner, in effect, guaranteed the payment of "rent" for 5 years.

In conjunction with its argument that the form of the transaction permitted it to maintain a more flexible financial position, petitioner argues that there was no obligation to exercise the purported option. See *Norman Baker Smith, supra.* We recognize the importance of this absence of obligation, but we do not find the argument controlling here. In the *Norman Baker Smith* case we noted that exercise required a substantial sum of money; in the instant case petitioner was "obligated" to exercise its option by dint of economics. It has already paid substantial amounts in "rentals," made costly leasehold improvements which could not be economically removed, and expended in excess of

---

[10] As respondents points out, the intraoffice memorandum, dated Feb. 13, 1964, helps to explain the odd amount of the purported option price. It appears that the figure $173,707.40 was reached, at least in part, by using a sales price of $342,700 and subtracting therefrom the "rental" payments.

[11] We are cognizant of the fact that the critical value is that which the parties could reasonably contemplate the property to have at the time of the option's exercise. However, no evidence was offered which indicates that the Blairsville Farm could have been expected to decline in value by 1967.

$100,000 for ditching and draining operations.[12] If petitioner was to retain the benefits of its expenditures, it behooved it to exercise the "option."

In *Breece Veneer & Panel Co.* v. *Commissioner*, 232 F.2d 319 (C.A. 7, 1956), reversing 22 T.C. 1386 (1954), the court rejected the above economic test as the sole criteria for deciding cases of this genre. We find *Breece Veneer* to be distinguishable and not persuasive here. In *Breece Veneer* the rental payments were found to be reasonable. The petitioner had been a lessee of the property prior to executing the agreement in question and the increase in rent was not found to be so substantial as to warrant a finding that the rental was more than fair. Further, the court was without evidence, we have before us, of a prior agreement to purchase, as well as evidence of an initial intent to purchase. In support of our conclusion that petitioner intended, *ab initio*, to purchase the Blairsville Farm, we refer to the intraoffice memorandum of February 18, 1964, set forth in our Findings of Fact. This memorandum makes it clear that petitioner always intended to purchase the property.

On brief, petitioner argues that under the law of Illinois the petitioner, as lessee, acquires neither title nor equity in the property by the payment of rent.[13] It is axiomatic that mere payment of rent only secures continued use and possession of the leasehold to the lessee; however, here petitioner has paid more than mere rent and the cases to which we have been referred do not touch upon this factor. More importantly, since we are not determining with whom title lies, but rather, the deductibility of rental payments for Federal income tax purposes, the law of Illinois does not control. *Weiss* v. *Weiner*, 279 U.S. 333, 337 (1929).

In conjunction with its assertion that title resided in Ben Nation during the years in issue petitioner stresses the importance of three additional factors: First, Ben Nation joined in certain condemnation proceedings; second, Ben Nation made provision for a preexisting tenant on the Blairsville Farm; and third, Ben Nation mortgaged the property after petitioner took possession of the property.

Ben Nation did join with petitioner in the dedications of portions of the Blairsville Farm for public roads; however, this is of doubtful probative force on the issue of with whom legal title resided, because in three of the four documents petitioner was the first to sign. In fact,

---

[12] We note, here, that these ditching and draining operations commenced in January of 1963. This together with the size of the expenditure indicates the petitioner's intent to purchase the property from the outset.

[13] We note that petitioner may be mistaken in its construction of the law of Illinois. In *Arco Bag Co.* v. *Facings, Inc.*, 18 Ill.App.2d 110, 151 N.E. 2d 438 (1958), it was held that when rent is equivalent to value and the lessee has an option to purchase the transaction is a sale as opposed to a lease.

this seems to imply that petitioner was the primary grantor. It is not inconsistent with our decision, herein, that Ben Nation joined in the dedication. Despite the fact that he was in the process of selling his property, until the final payment was made he maintained a substantial interest in the Blairsville Farm.

The fact that Ben Nation requested the petitioner to permit a former tenant to remain in possession does not aid the petitioner's cause. The request seems to us to have been of a personal nature and in any case was hardly inconsistent with the sale of the property.

On May 25, 1964, Ben and Maude Nation and petitioner executed a mortgage indenture on the Blairsville Farm. Ben received $200,000 at 5½-percent interest and he alone was personally liable on the note therefor. These circumstances do not militate against our decision. A similar situation was presented in *D. M. Haggard, supra* at 1127, and this Court, in holding for the respondent, did not feel the issue merited discussion. In the case at bar the mortgage permitted Ben Nation to obtain $200,000 cash in hand, relieving him of the necessity of waiting for the balance of the purchase price. The transaction was also beneficial to the petitioner, because by assuming the mortgage, on February 7, 1968, it reduced its cash obligation to Ben Nation to $1,267.94. If they have any relevancy, these factors seem to indicate a convenient method of financing a sale.

Another point that petitioner raises is that breaches of various provisions [14] in the lease agreement could have resulted in a termination of said agreement rendering it impossible for petitioner to exercise its option. It suffices to say that the remedies to all of these eventualities lay within the control of petitioner. Petitioner also refers to its option to terminate in case of a defect in Ben Nation's title. Needless to say that in any sale of property this possibility is present.

Finally, petitioner alludes to the fact that it could terminate the transaction in the event of the condemnation of all or a part of the property. Petitioner, however, did not offer any evidence to show that a condemnation, so substantial as to make termination a possibility, was in the offing. In the event of a lesser condemnation petitioner was given the option to continue in possession and to apply the award towards restoration of the property. In addition, in the event of a partial condemnation provision was made for a partial abatement of "rent" which, in effect, means a partial abatement of the purchase price.

In summary, upon consideration of the entire record we are convinced that through purported rental payments petitioner was acquir-

---

[14] Provisions such as failure by petitioner to pay rent and utilities, to make repairs after removal of fixtures, to keep liens off the property and to provide fire insurance, or Nation's failure to pay property taxes.

ing a substantial equity in the property in accordance with the result intended by the parties. Consequently, we hold that said payments were not deductible as rent under section 162(a)(3).

## Issue 2

This leaves for our consideration the question of the several useful lives of certain "leasehold" improvements. At the outset we should state our conclusion that the purported lease of the Blairsville Farm was in substance a sale of the property means that the petitioner cannot depreciate the contested items over the term of the purported lease, but rather, must depreciate them over the term of their actual useful lives. The respondent determined that each improvement set forth in the notice of deficiency had a useful life of 20 years, with the exception of certain expenditures for clearing work which respondent had disallowed in their entirety. Rule 32 of the Tax Court Rules of Practice provides that "The burden of proof shall be upon the petitioner." We find that, with the exception of one item, petitioner has failed to satisfy this burden.

At trial we were presented solely with the uncorroborated testimony of one of petitioner's employees. To put it mildly, this fails to convince. In each instance this witness merely stated his opinion as to the useful life of a particular item without giving any reason therefor.

We stated above that there was one exception. Petitioner's witness stated that three tanks with a cost of $1,687.47 [15] have a useful life of no more than 8 years. As to these tanks alone petitioner's witness provided an explanation for his estimate. Admittedly our knowledge of the effects of fertilizer on steel is limited but it seems reasonable to us that corrosion will destroy a tank's usefulness in 8 years. Accordingly, we hold for the respondent except as to those tanks used for fertilizer and identified by their purchase price of $1,687.47. As to these we hold the useful life to be 8 years.

In view of the foregoing,

*Decision will be entered under Rule 50.*

---

[15] The deductions pertaining to these tanks were $421.87 and $632.80 for 1964 and 1965, respectively.