Raymond Beaudry and Mary A. Beaudry v. Commissioner.
Beaudry v. Commissioner
Docket No. 6408-70.
United States Tax Court
T.C. Memo 1972-214; 1972 Tax Ct. Memo LEXIS 43; 31 T.C.M. (CCH) 1054; T.C.M. (RIA) 72214; October 4, 1972
*43 Leo F. Young, 1170 Pearl St., Eugene, Ore., for the petitioners. Joseph M. Wetzel, for the respondent. TANNENWALD
Memorandum Findings of Fact and Opinion TANNENWALD, Judge: Respondent determined the following deficiencies in petitioners' income tax: Taxable Year
Deficiency
1966
$ 473.92
1967
9,832.95
We are asked to determine whether payments received by petitioners under a "leaseoption" agreement should be characterized as rental income or income from the sale of property used in petitioner Raymond Beaudry's tugboat business. Findings of Fact Some of the facts have been stipulated and are incorporated herein by this reference. The petitioners, Raymond Beaudry (hereinafter referred to as petitioner or Beaudry) and Mary A. Beaudry, are husband and wife who, at the time their petition herein was filed, resided in Coos Bay, Oregon. They timely filed joint income tax returns for 1966 and 1967 with the district director of internal revenue for the district of Oregon; an amended return for 1966 was filed with the Internal Revenue Western Service Center, Ogden, Utah, on or about April 15, 1968. Mary A. Beaudry is a party herein solely because *44 she filed a joint return with petitioner for the years in question. Harbor Tug and Barge Company (hereinafter referred to as Harbor), a sole proprietorship, was engaged in the business of operating tugboats and barges primarily in Coos Bay, Oregon. Petitioner, the owner and operator of Harbor since 1947, left high 1055 school after six weeks and received no further formal education thereafter. In December of 1965, Harbor's fleet included eight tugboats, one of which was known as the "Rebel." At all times pertinent, Pacific Inland Navigation Co., Inc. (hereinafter referred to as PINC) and Alaska Barge and Transport, Inc. (ABT) were members of a group of related companies collectively known as "PAC." Their principal business was tugboating, barging, shallow draft shipping, and over-the-beach cargo handling. Most of this work was performed on the western coast of the United States and Alaska. In late 1965, the United States Government determined that there was an urgent need for tugboat and barge service in Vietnam. On December 8, 1965, ABT entered into a written letter commitment with the Military Sea Transportation Service (MSTS), whereby ABT would prepare for and perform *45 tugboat and barge service in Vietnam. The letter commitment, which contemplated the execution of a formal contract in the future, provided that, in return for a fixed price, ABT was to provide all the necessary facilities (the cost of which would be included in the contract price) to effectuate the movement and handling of cargo in and around Vietnam. Services were to be provided by ABT for a period of three years, commencing immediately. MSTS was to have the right to terminate the contract at any time, with ABT to be reimbursed for any expenses incurred as a result of the termination. Although ABT was not in a strong financial position at the time, it nevertheless began to acquire or lease the equipment deemed necessary to immediately commence performance under the letter contract. Harry Holmes, an ABT employee at this time, inspected the Rebel late in 1965, determined that it was suitable for ABT's needs in its Vietnam operation, and suggested to petitioner that, if he was interested in pursuing the matter further, he should get in touch with John L. Bullock, president of ABT. On January 10, 1966, petitioner, as Owner, and PINC, as Charterer, entered into an agreement entitled *46 "Demise Charter Party - Tug Rebel," which provided, in pertinent part, that (1) the term of hire was for two years, effective upon delivery of Rebel, as is, to PINC; (2) the rate of hire was to be $125 per day, payable monthly in advance (this sum was in fact paid monthly throughout the years in question); (3) the cost of repairs, maintenance, and insurance was to be borne by PINC; (4) PINC had an option to renew the agreement on a year-to-year basis and an option to purchase; and (5) the Rebel was to be returned to Coos Bay, Oregon, at the end of the charter in the event that the option to purchase was not exercised. An addendum to the agreement, also dated January 10, 1966, granted PINC the following option: Charterer has an option to purchase the tug and its equipment for the sum of $150,000 at any time during the term of the charter, as is, where is, against which price Charterer shall receive credit for seventy-five percent (75%) of the charter hire paid during the first year of the charter (if the option is exercised at all during that period of time) and for one hundred percent (100%) of the charter hire if said option is exercised after the first year of the term. Charterer *47 shall exercise said option, if at all, by notice in writing to Owner before expiration of the charter term, or extensions thereof. Terms of purchase if the option is exercised shall be net cash at the time the notice is given. [1]
The addendum also contained the following provision relating to insurance: Charterer at its sole expense shall insure the tug under policies of American Hulls Institute full form hull insurance, or equivalent, including world trading limits, not to exceed $10,000 deductible, and with deletion of the exclusionary War Risks clause, at a value of not less than $150,000, together with Protection & Indemnity insurance in not less than the same amount, which said policies shall name charterer as the assured and Owner as an additional *48 assured as their respective interests shall appear, and also shall name Charterer as the loss payee, and Owner as an additional loss payee only as to any claim in excess of $25,000. Charterer shall furnish Owner with copies of the relevant policies or cover notes, with evidence of renewals thereof, and with confirmation from underwriters that Owners shall be notified, in writing, a 1056 sufficient time prior to a proposed cancellation to permit Owner to protect its interest by payment of delinquent premiums and/or procurement of other insurance, or otherwise. Finally, the addendum contained the following undertaking: If the tug should be lost or otherwise taken from Charterer by requisition of title, Charterer shall promptly pay Owner the agreed value of the tug and its equipment as chartered, to-wit, $150,000 against which price Charterer shall receive credit for seventy-five (75%) or one hundred percent (100%) as the case may be of the charter hire padd Owner for said tug under the terms hereof and Paragraph 6 of the Addendum. Charterer shall have the benefit of any insurance or indemnification received by Charterer or Owner from third persons, even if such indemnification *49 exceeds the agreed value, and Charterer shall have credit for charter hire prepaid past the date of such loss or taking. [2]
PINC subsequently assigned its rights and obligations under this agreement to ABT. Shortly thereafter, ABT took possession of the Rebel and transported it to Vietnam for use in ABT's operations. On January 10, 1966, the Rebel was insured for $150,000 under a policy taken out by ABT and PINC. Other vessels were also covered by the policy. Harbor was listed as an "Additional Assured" under the policy with respect to the Rebel "while under Bareboat Charter" to ABT. Payment of loss, with respect to the Rebel, was to be made to ABT. On February 16, 1966, the maximum coverage on the Rebel was increased to $187,500. War Risk insurance was subsequently taken out on the Rebel, inter alia, the maximum coverage on the Rebel again being $187,500. With respect to this increased coverage, Harbor was named as an "assured" without further characterization, and provision for payment of loss to ABT was confirmed. Shortly *50 after shipment of the Rebel to Vietnam, petitioner arranged for the construction of a new tugboat, eventually named the Renegade. The Renegade's specifications and capabilities were very similar to those of the Rebel. The cost of the Renegade to petitioner was approximately $80,000. At least part of the purchase price was paid out of the proceeds of a $96,000 loan obtained by petitioner from the United States National Bank (United) on or about October 11, 1966. Petitioner gave United a second mortgage on the Rebel as security therefor. [3] The Renegade was eventually placed into service in September of 1966. On September 15, 1966, the demise charter party was amended so as to require PINC to add the name of United as well as Harbor to any policies covering the Rebel as a "second assured." On November 30, 1967, petitioner owed United $37,150. On October 31, 1966, ABT and MSTS entered into a formal contract superseding their letter agreement of December 8, 1965. It provided, in pertinent part, as follows: (a) The contract was a cost-plus-award *51 fee type agreement; (b) ABT was to provide certain services to the United States Government anywhere in the world, particularly in and around the waters of South Vietnam; (c) The contract was for a 3-year period, beginning December 8, 1965, with the Government having an option to renew for one additional year; (d) Allowable costs included depreciation of the acquisition costs of specified tugs and barges owned by ABT and PINC and committed to the performance of the contract over a 2-year period beginning January 8, 1966, after which title would immediately vest in the Government; (e) The charter rate for three tugs (including the Rebel) and four barges chartered by ABT from third parties was a reimbursable cost "until the purchase prices defined in the respective charter contracts are paid in full by application of the charter hire" or until the termination of the contract or its renewal, whichever came first; and (f) The government retained the option to require ABT to exercise its option on any of the vessels on behalf of the Government, in which case any further sums paid by ABT in order to acquire title were to be considered reimbursable costs. [4]
*52 On November 29, 1967, ABT requested permission from MSTS to exercise its 1057 option to purchase the Rebel; permission was granted by letter dated December 15, 1967. On December 15, 1967, ABT notified petitioner of the former's intent to exercise its option under the charter party. On January 31, 1968, ABT sent a certified check for $67,875 (representing the balance of the purchase price under the Rebel charter party) to United as escrowee in accordance with petitioner's instructions. The balance of the purchase price was computed under the terms of the original agreement, without reference to the option clause in the addendum. See footnote 1, supra. United, in turn, delivered a bill of sale executed by petitioner conveying title to the Rebel to PINC (the actual holder and exerciser of the option). PINC simultaneously conveyed title to ABT. In the course of handling this transaction, petitioner's lawyer characterized Harbor as the "owner of the tug 'Rebel.'" At all times prior to exercise of the option, ABT recorded the Rebel transaction as a lease upon its books and records and treated the monthly payments made to Harbor as "charter rent." Harbor's deposit summaries for *53 1967 reflected the Rebel as under "lease." In his original return for 1966, prepared by his accountant, petitioner reported money received from the Rebel transaction as rental income and claimed depreciation with respect to the Rebel; in 1968, he amended his 1966 return, and both the latter and his 1967 return reported money received under the charter as income from the sale of property used in petitioner's trade or business without any claim for depreciation with respect to the Rebel. [5]
The cost of returning the Rebel to Coos Bay from Vietnam was not less than $36,700. Ultimate Finding of Fact The arrangements between Harbor and ABT constitute a lease and the monthly payments received by petitioner during the taxable years in issue were rent. Opinion The issue herein can be stated very simply: Did the demise charter party constitute, on the one hand, a lease with the payments in question taxable to petitioner as ordinary income or, on the other hand, a sale with such payments *54 taxable as longterm capital gain? The waters which we must navigate in order to arrive at a decision are filled with shoals. The buoys are numerous, involving the intent of the parties as revealed by their actions and the agreements, the legal effect of various provisions of those agreements, and the economic indicators derived from an evaluation of the financial arrangements. In charting our course, we pay homage to the timehonored principle, so often mandated in cases of this kind, that it is the substance and not the form of the transaction which is determinative. [6] See Starr's Estate v. Commissioner, 274 F. 2d 294, 295 (C.A. 9, 1959), reversing on grounds not involved herein 30 T.C. 856 (1958); Northwest Acceptance Corp., 58 T.C. - (August 14, 1972); Karl R. Martin, 44 T.C. 731, 740 (1965), affirmed on this issue, 379 F. 2d 282 (C.A. 6, 1967). In the final analysis, the ultimate question is one of fact, M & W Gear Co., 54 T.C. 385, 393 (1970), *55 affirmed on this issue, 446 F. 2d 841 (C.A. 7, 1971), with the determination to be made at the time the parties entered into the transaction and not in retrospect. Northwest Acceptance Corp., supra. As our findings of fact show, the underlying demise charter party was in form a lease and the parties, in their books and records, consistently treated the monthly payments thereunder by ABT to Harbor as rent. Petitioner's actions in placing mortgages on the Rebel in February 1965 and October 1966 and the description of Harbor as the "owner of the tug" by petitioner's lawyer in January 1968 accord with this treatment. It was not until later in 1968, long after the option to purchase contained in the demise charter party had been exercised and title to the Rebel had passed from Harbor to ABT, that petitioner had a change of heart and filed his 1967 return and an amended 1966 return claiming that these payments should properly be treated *56 as the proceeds of a sale. Concededly, petitioner testified at the trial that he considered that he had sold 1058 the Rebel, but we have evaluated this testimony in light of the other overt manifestations by petitioner and his agents, which reflect a different understanding of the nature of the transaction. We also have taken into account the fact that, aside from Harry Holmes, who simply made the initial contact with petitioner regarding the acquisition of the Rebel, no representative of ABT or PINC testified as to how it viewed the arrangements. Jerome J. Sonnenborn, 57 T.C. 373, 383 (1971), and cases cited therein; Michael Pendola, 50 T.C. 509, 519 (1968). In light of the foregoing, the focal point of this case is whether the economic indicators made the exercise of the option given to PINC to acquire the Rebel a realistic imperative. Neither the presence nor absence of such an option is determinative of the lease versus sale issue. Compare Kitchin v. Commissioner, 353 F. 2d 13 (C.A. 4, 1965), affirming a Memorandum Opinion of this Court; Starr's Estate v. Commissioner, supra; Chicago Stoker Corporation, 14 T.C. 441 (1950). *57 The presence of an option to purchase does, however, accord a dual potentiality to an ostensible lease arrangement. See D. M. Haggard, 24 T.C. 1124, 1128 (1955), affirmed per curiam, 241 F. 2d 288 (C.A. 9, 1956). As one textwriter has put it, "Many payments made under lease arrangements with options to purchase have chameleon characteristics - they may appear as rentals at one time and as purchase price at another." See 4A, Mertens, Law of Federal Income Taxation (Riordan Rev.), p. 450. The transaction herein specified that, in the event that the option was exercised, 90 percent of rental payments would be credited against the purchase price. Over the fixed two-year period of the demise charter party these rentals totalled over $90,000. The heart of petitioner's claim is that, because the amount thus to be credited, taken in conjunction with the cost of fulfilling ABT's obligation to return the Rebel to Oregon, represents a substantial portion of the fair market value of the Rebel and because the $125 daily rental payment substantially exceeded the fair rental value of the Rebel, it necessarily follows that the option would be exercised. From this, petitioner *58 concludes that the transaction should be treated as a sale. We find several gaps in petitioner's reasoning. In the first place, we found the testimony of petitioner's witness that the fair rental value of the Rebel would be $50 - $65 a day unpersuasive. His qualifications as an expert were, to put it mildly, minimal and we are not convinced, in the context of the totality of the direct examination, that he fully appreciated the fact that the question with respect to such value related to the deployment of the Rebel in a war zone. Secondly, in the instant case, we do not have a situation where the amount of rentals to be credited approximates the fair market value of the Rebel. Petitioner accepts the premise that the fair market value of the Rebel for the purposes of this case is $150,000. The record is silent as to how the parties arrived at this figure. We note, however, that the cost of a new and comparable ship - the Renegade - was only $80,000. It seems to us that the fair market value of the Rebel could not significantly exceed this amount. Even taking into account the cost to ABT of returning the Rebel to Oregon, it would not be until the first renewal year, i.e., the third *59 year of the demise charter party, that the out-of-pocket cost to PINC would approximate the $150,000 figure. [7] Finally, the hard fact is that, when the option was exercised in December 1967, petitioner received an additional $67,875 beyond the aggregate of the monthly payments - a not insubstantial amount. We have no doubt that petitioner probably did not expect to get the Rebel back. But this attitude stems from the peculiar fact of use in a war zone and the potential loss due to enemy action. Indeed, this perhaps explains why the Rebel was insured for $150,000 and the fact that ABT was entitled to recoup the monthly payments from the insurance proceeds. Both parties wanted to come out whole in the event of loss. Petitioner wanted to be sure he had enough money left after taxes to pay the purchase price of the Renegade and PINC (or the Government through ABT and PINC) wanted to be reimbursed for the bulk of the amounts which it had paid under the demise charter party. Cf. Breece Veneer & Panel Co. v. Commissioner, 232 F. 2d 319, 324 *60 (C.A. 7, 1956), reversing 22 T.C. 13861059 (1954). The need for insurance in the amount of $150,000 to accomplish these objectives may well explain why the option price was set at the same figure, namely, to establish that value for insurance purposes. Under the foregoing circumstances, we conclude that the economic indicators are not inconsistent with the intent of the parties as revealed by their agreements and actions, that the transaction should be treated as a lease. We thus have no need to consider the extent to which the economic indicators should prevail over seemingly contrary expressions of the parties. Cf. Starr's Estate v. Commissioner, supra; Osterreich v. Commissioner, 226 F. 2d 798 (C.A. 9, 1955); M & W Gear Co., supra; D. M. Haggard, supra; Truman Bowen 12 T.C. 446 (1949). See also Western Contracting Corporation v. Commissioner, 271 F. 2d 694 (C.A. 8, 1959), reversing a Memorandum Opinion of this Court. In short, we conclude that in this case the substance and the form of the transaction coincide and that accordingly the monthly payments by PINC to Harbor constitute *61 rent and are taxable to petitioners as ordinary income. Decision will be entered under Rule 50. Footnotes
1. This provision supplanted a provision in the basic agreement which granted PINC a similar option and a flat credit for 90 percent of the hire paid to Harbor up to the time of exercise. For reasons not clear in the record, it was this provision rather than the addendum provision which was applied when the option was exercised. The amount of credit was $79,843.75 under the addendum provision and $82,125 under the basic provision.↩
2. This provision supplanted a provision in the basic agreement which granted PINC a flat credit of 90 percent of the charter hire paid to Harbor.↩
3. In February of 1965, petitioner had borrowed $20,000 from the same bank, and a first mortgage was put on the Rebel at that time.↩
4. This agreement was amended in parts not relevant herein on March 6, 1967.↩
5. In this proceeding, petitioner claims an overpayment for 1966 by virtue of his alleged incorrect treatment of the transaction with ABT as a lease rather than a sale on his 1966 return.↩
6. Forty years ago, Judge Learned Hand characterized "recourse to such vague alternatives as 'form' and 'substance,'" as "anodynes for the pains of reasoning." See Commissioner v. Sansome, 60 F. 2d 931, 933↩ (C.A. 2, 1932).
7. Even if we accept petitioner's claim of a $57,660 cost of returning the Rebel, the critical point would not be reached until the end of the original two-year period.↩