READE MANUFACTURING COMPANY, INC., ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Reade Mfg. Co. v. Commissioner
Docket Nos. 1782-71, 1783-71, 1784-71, 1785-71.
United States Tax Court
T.C. Memo 1973-259; 1973 Tax Ct. Memo LEXIS 31; 32 T.C.M. (CCH) 1225; T.C.M. (RIA) 73259; November 26, 1973, Filed *31 Laurence Reich and Hugh B. McCluskey, for the petitioners. John J. O'Toole and Timothy L. Nelson, for the respondent. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Judge: In these consolidated cases the respondent determined the following Federal income tax deficiencies: 2 Petitioners
Docket No.
Year
Deficiency
Reade Manufacturing Co., Inc.
1782-71
4-30-64
$17,405.80
Leonard J. and Laurene S. Reade
1783-71
1964
597.66
1965
6,777.49
1966
14,845.60
Charles F. and Jane B. Reade
1784-71
1964
517.64
1965
3,729.30
1966
5,690.58
Charles H. Reade and Estate of Olive F. Reade, Deceased
1785-71
1964
387.36
1965
4,160.02
1966
7,079.14
Certain issues have been either conceded or not raised by the petitioners. The only issue presented for our decision is whether payments made by United StatesBorax & Chemical Corporation to Reade Manufacturing Company, Inc., during the taxable years ended April 30, 1964, 1965 and 1966, were proceeds from an installment sale of capital assets held for more than 6 months or were rental income. The answer depends upon whether an agreement *32 dated November 18, 1963, between the two corporations was a lease with an option to purchase or an installment sale. FINDINGS OF FACT Some of the facts have been stipulated by the parties. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference. General Reade Manufacturing Company, Inc. (herein sometimes called the Company or Reade), is a New Jersey corporation. At the time it 3 filed its petition in this proceeding its principal office was located in Lakehurst, New Jersey. The Company kept its books of account and filed its Federal income tax returns using the accrual method of accounting on a fiscal year ending April 30. The Federal income tax return of the Company for the fiscal year ended April 30, 1964, was timely filed. On May 1, 1964, the Company made a valid election under Subchapter S of the Internal Revenue Code. For the fiscal years ended April 30, 1965, and April 30, 1966, it filed timely Federal income tax returns as a United States Small Business Corporation (Form 1120-S). At all times during the taxable years involved herein the petitioners Charles H. Reade, Charles F. Reade and Leonard J. Reade *33 (hereinafter sometimes collectively referred to as the Reades) were the holders of all the capital stock of Reade Manufacturing Company, Inc. Leonard J. and Laurene S. Reade were legal residents of Red Bank, New Jersey, when they filed their petition herein. Charles F. and Jane B. Reade were legal residents of Lavallette, New Jersey, when they filed their petition herein. Charles H. Reade was a legal resident of Asbury Park, New Jersey, when he filed his petition herein. The Estate of Olive F. 4 Reade was represented by the executor of the estate, Carroll A. Boynton, whose legal residence at the time of filing the petition herein was Far Hills, New Jersey. All the individual petitioners filed timely Federal income tax returns for the taxable years in issue. Reade Manufacturing Company, Inc. Founded in 1883 by the grandfather of Charles H. Reade, the Company was engaged in herbicide research, formulation and application. The term herbicide was coined by the founder of the Company. Reade has specifically been engaged in the application of vegetation control chemicals for the United States railroad industry since 1911. American railroads must control vegetation *34 growth immediately adjacent to their track beds. This is done for two reasons: vegetation growing in a track bed will loosen the gravel ballast causing it to slide from the roadbed with a consequent weakening of that surface; vegetation growing immediately adjacent to the track can restrain dust and dried vegetation presenting a fire hazard to surrounding land. In order to control such vegetation some railroads hire an independent contractor, such as the Reade Manufacturing Company, Inc., to apply defoliants to their track beds. Other railroad companies performed the job using their own personnel. 5 To perform this job the Company had over the years acquired property close to railroad centers where it located its plants. The job was a seasonal one requiring great effort for a short period of time. In addition, the usual contract called for the Company to provide the herbicide as well as the labor and specialized equipment necessary for its application. The Company owned or leased plant sites in Alabama, Illinois, New Jersey, Minnesota, Missouri and Arkansas. Utilizing basically the same equipment each plant contained mixing and storage tanks as well as railroad tank cars *35 and spray cars. The Company was functionally divided into two divisions: the Railroad Division and the Metals Division. The Railroad Division was engaged solely in the business of weed control. During the mid-1950's this division achieved its peak production years. Sales peaked at about $1,500,000. During this time it was shifting from the use of arsenic derivative defoliants to borate-based chemicals.
Preliminary Negotiations In the early months of 1963 the Reades gave serious thought to disposing of the Railroad Division. At that time Charles H. Reade was in his middle seventies and Leonard J. Reade was approaching retirement age. Charles F. Reade, the son of 6 Leonard Reade, was the remaining link to the Company. Yet he was interested in the operation of the Metals Division. In the five years prior to 1963 several large companies, including DuPont, Monsanto and U.S.Borax, had entered the field of manufacturing liquid herbicides. All of these companies were far larger in both size and financial strength than Reade Manufacturing Company. They all had substantial contacts with the railroad industry by virtue of the heavy volume of freight traffic their manufacturing *36 divisions originated. This competition was taking its toll on the Company's sales and share of the market which were steadily declining. The Company lacked the personnel and financial resources to effectively compete with the large firms then entering this market. Consequently, the Reades decided to dispose of the Railroad Division and were receptive to an expression of interest received from United StatesBorax & Chemical Corporation (herein called Borax). Borax had performed an in-house market survey and had determined that the market was one in which their expertise could be profitably employed. With this fact in mind, Borax then concerned itself with the best method of entering the field. Early in 1963 Borax had heard a trade rumor that the Railroad Division of Reade Manufacturing Company, Inc., was available for sale. On May 23, 7 1963, William J. Dibble, then Director of Marketing for Borax, and L. M. Stahler, then Director of Agricultural Sales, met with the Reades to begin negotiations. After the meeting Mr. Dibble wrote a memorandum to his immediate supervisor which was ultimately forwarded to Hugo Riemer, the president of Borax. The memorandum set forth Mr. *37 Dibble's impressions of Reade Manufacturing Company, Inc., its personnel and performance. He noted that the Company claimed some tentative inquiries from other "raw materials" companies but that nothing had yet developed. He also noted that the Reades would only be interested in disposing of the Railroad Division as a package and would not consider piecemeal sales. His memorandum contained the following summary: In our opinion this company holds good possibilities for us as an acquisition, either from the standpoint of simple purchase of the equipment, or purchase of their herbicide business. It would certainly give us a quick entree into the part of the railraod business (application) lack of which has handicapped us in our sales efforts with many of the railroads; principally those East of the Mississippi River where much of the business is handled on an application basis. It, too, would certainly expand our opportunities for doing business West of the Mississippi River. The spray application equipment itself, though it may not be the latest and greatest, is no doubt adequate to do the job and is in existence. Entree into this business on a construction basis, rather than *38 purchase, would require a considerable amount of time and no doubt would entail some headaches which have already been 8 experienced by and overcome by these people. Both Dr. Stahler and I felt that aggressive younger management could undoubtedly improve any profit experience these folks had had in recent years. During June and July of 1963 representatives of Borax conducted an inspection tour of the facilities of Reade Manufacturing Company for the purpose of evaluating in detail the condition of the assets. Out of these inspections came an evaluation of the assets involved. The "Acquisition Study" valued the real property, equipment and rolling stock at $640,000. The Reades had previously valued the same assets at $876,000.The "Acquisition Study" recommended that Borax quickly move to acquire the facilities of Reade Manufacturing Company. On September 4, 1963, an "Analysis of Potential Profit to U.S.Borax by Acquisition of Reade Manufacturing Company Facilities" was forwarded to Riemer. The last section of the analysis set forth four negotiating proposals. They were listed in descending order of desirability to Borax. They ranged from a 3-year lease with an option *39 to purchase to an outright purchase for a lump-sum amount. All proposals were based on an assumed value of $750,000 for the business. The proposals each involved different amounts to be paid because they recognized the time value of the funds. The proposals were as follows: 9 Alternate #1 Lease for three years with option to purchase at the end of the third year. (This provides the opportunity for U.S.BORAX to test the business without committing a large sum of capital.) Suggested payments are: Initial Payment
$100,000
Payment at end of 1st year
$100,000
Payment at end of 2nd year
$100,000
Payment at end of 3rd year (Payment to be made to complete purchase)
$546,000
Total Payments
$846,000
Alternate #2 Time payment purchase over five year period with right of forfeiture at any time after the beginning of the third year. Suggested schedule of payments: Initial Payment
$165,000
Payment at end of 1st year
163,859
Payment at end of 2nd year
163,859
Payment at end of 3rd year
163,859
Payment at end of 4th year
163,859
Total Payments
$820,436
Alternate #3 Time payment purchase over five year period, *40 no right of forfeiture. Initial Payment
$160,000
Payment at end of 1st year
158,728
Payment at end of 2nd year
158,728
Payment at end of 3rd year
158,728
Payment at end of 4th year
158,728
Total Payments
$794,912
Alternate #4 Lump sum payment of $750,000. 10 With an investment of $750,000 the analysis projected a payout period of 3 years assuming constant material costs and a steadily increasing sales volume. On September 19, 1963, Carl L. Randolph, then Assistant to the President of Borax, together with two associates met with the Reades at the Reades' offices. At that time the Reades were not represented by counsel. The purpose of the meeting was to arrange for the "acquisition" [2] by Borax of the Railroad Division. At such meeting the Reades offered to sell the assets for $1,000,000. Randolph countered by saying he was thinking in terms of $700,000. *41 The Reades then offered to "split the difference" and the price was fixed at $850,000. Having settled upon a price, the parties then attempted to determine what form the transaction should take. Randolph initially suggested a 3-year lease with an option to purchase. The Reades rejected this proposal and insisted on a 5-year term with guaranteed payments. Borax would have the option to purchase the assets after 5 years. 11 In order to memorialize their understanding Randolph prepared a memorandum dated September 19, 1963, setting forth the agreement, which was signed by the parties. The memorandum reads: This communication is being drawn for the purpose of confirming the general understanding arrived at in this office today between representatives of U.S.Borax & Chemical Corp. and Reade Manufacturing Company, Inc. U.S.Borax is interested in acquiring the manufacturing facilities, the service equipment and the organization that is active in the Railroad department of Reade Manufacturing Company, Inc. Subject to confirmation, the following terms have been agreed upon. U.S.Borax is to have a 5-year absolute net lease of all such facilities at a rental of $100,000.00 *42 per year. U.S.Borax is to have an option to purchase all such assets, at a sales price of $350,000.00, at the end of the initial 5-year lease term. Upon the execution of the lease, the lessor is to purchase, at raw material cost, all live raw material and finished products entering into the production of Railroad chemical weed killer. It is understood that the value of the inventory of raw material and finished product is not to exceed $125,000.00. Attempted Renegotiation On October 1, 1963, the Reades contacted legal counsel to advise them with respect to the transaction. On October 3, 1963, a conference call was arranged among the Reades and their counsel with Messrs. Randolph, Stahler, Dibble 12 and McDonald, who was then Borax's Associate General Counsel. Counsel for the Reades inquired as to whether the agreement could not be recast into an outright sale for cash or stock. Borax would not agree to this and indicated that it could not recast the agreement to be anything but a lease with an option to purchase. In a memorandum to the files on the Reade matter, Mr. McDonald of Borax noted with respect to public announcements: 1.Press Announcement - Kockler *43 and Marketing had drafted announcement of the "purchase" of Reade, etc. This, of course, is wrong. The word "acquisition" was next considered, and we ruled this out. I recommended the words "Borax has leased the facilities of Reade", but Randolph said Marketing Department would not go for this. He recommended the words "Borax has assumed the operations of the plants and other facilities of Reade". I agreed on this. I would prefer the word "leasing", but Randolph's language is correct enough, i.e., we are operating or taking over the operation of Reade's physical assets - we are not saying we are taking over "the business" of Reade. So, legally and tax-wise I would still prefer leasing wordage - but legally and tax-wise I think Randolph's is next best and is acceptable. * * * I emphasized again we should avoid any reference to acquisition of business, for antitrust reasons; and avoid any reference to purchase or intention to purchase because "intention" is the key from a tax viewpoint as to whether a document is a lease or a title - retention transaction, e.g., conditional sale. We should avoid any announcements that would fall into the Reade thinking, i.e., announcements *44 that tend to support the intention to purchase the lease at any time. 13 On November 18, 1963, officials representing Borax and Reade entered into an agreement entitled "Contractual Arrangements." In it Reade represented that it owned in fee certain properties or was the lessee in good standing with respect to certain other properties. Borax stated that it desired to utilize the property and therefore wished to: 1. Purchase certain inventory items. 2. Acquire by sublease property then leased to Reade. 3. Acquire a lease and option-to-purchase with respect to property owned by Reade used in spray application. The document contained a "Lease and Option to Purchase" both long and short form. The lease described the property covered and declared the intention of the parties that it be considered a "net lease" in favor of the lessor. The term was 5 years unless shortened by the lessee's exercise of the option to purchase. Article IV sets forth the rental that the lessee was to pay the lessor. The yearly rent of $100,000 was payable in advance upon each anniversary date of the agreement. Article XIX gives the lessee a preferential right to purchase the leased *45 properties if any outside offer to purchase is received by the lessor during the term of the lease. If not exercised by the lessee, this provision requires that any subsequent sale be 14 made expressly subject to the lease and option to purchase then held by Borax. A failure to purchase under Article XIX was not to affect the lessee's rights under Article XXI - Option To Purchase. Under this article the parties set forth the purchase price. The price was set at $850,000 and it decreased by $100,000 per year for 5 years. At the end of the fifth year the purchase price under the option was $350,000, payable in cash. This article was inserted at the request of the Reade's counsel. In its Annual Report for the year 1964 Borax disclosed that through its Agriculture Chemical Sales Division "arrangements were completed to assume management and operation of the six herbicide formulating plants and the railraod application equipment of Reade Manufacturing Company, Inc." The Balance Sheet shown in the report added footnote seven to the financial condition which stated: In addition [to office lease], the company is obligated under sundry plant leases aggregating $1,500,000, varying *46 in terms from five to ten years, with total annual rental payments of $225,000 to $100,000. In its 1965 Annual Report, Borax reported that income before taxes was lower than the preceding year because of "disappointing results" in the herbicide area "where efforts to develop new markets have not yet been wholly successfull * * *." 15 Effective November 18, 1963, Reade ceased the operation of its Railroad Division. Any and all employees employed in that division prior to November 18, 1963, ceased their employment by Reade and became employees of Borax. Pursuant to the agreement, Reade procured policies of title insurance with respect to the interest of Borax in the real property and took action to remove liens and encumbrances thereon other than those referred to in the agreement. In the taxable year ended April 30, 1964, Borax paid to Reade under the agreement the sum of $210,069.45 and in each subsequent such fiscal year involved herein Borax paid to Reade the sum of $100,000 thereunder. During the taxable years involved herein, effective November 18, 1963, Borax paid all taxes and assessments levied against the assets of the Railroad Division, all charges and assessments *47 for utilities and services with respect thereto, all expenses relating to the repair, maintenance, and upkeep thereof and the cost of all insurance applicable to such property.
Borax did not exercise the option enabling it to acquire complete ownership because changed market conditions made it impossible for Borax to operate at a profit. The leased properties were returned to Reade following termination of the lease. Since the 16 return of such assets, Reade has not engaged at any time in the railraod herbicide application business. All of the petitioners reported on their Federal income tax returns for all of the years in question the payments made by Borax to Reade as proceeds from the sale of capital assets entitled to treatment as proceeds from the sale of capital assets held for more than 6 months. In his notices of deficiencies dated December 15, 1970, the respondent determined that such $100,000 payments for each year constituted rental income to Reade Manufacturing Company, Inc., rather than the proceeds of an installment sale of capital assets held for more than 6 months. ULTIMATE FINDINGS OF FACT The contractual arrangement entered into between Reade Manufacturing *48 Company, Inc., and United StatesBorax & Chemical Corporation was a lease with an option to purchase.It was not a sales-purchase agreement in the guise of a lease agreement. Borax did not at any time acquire title to or an equity in the Reade Railroad Division. 17 OPINION The agreement of November 18, 1963, is clearly written in the technical vernacular and in the form of a lease with an option to purchase. Faced with this situation, which is endemic to this particular and frequently litigated issue, the petitioners argue that the substance of the agreement differs from its form and that, in essence, the transaction was an installment sale of the assets and business of the Reade Railraod Division to Borax. To the contrary, respondent contends that in substance as well as in form the transaction was a lease with an option to purchase, and that there is no support in the record for the conclusion that the agreement was a subterfuge. The parties agree that whether what is in the form of a lease is in reality a contract of sale or a lease depends upon the intention of the parties as evidenced by their agreement. *49 Benton v. Commissioner, 197 F.2d 745 (C.A. 5, 1952). They also agree that "the intention of the parties cannot be determined unilaterally." Breece Veneer & Panel Co. v. Commissioner, 232 F.2d 319, 320 (C.A. 7, 1956). Thus the proper standard for determining the Federal income tax consequences of this transaction is the intent of the parties and the substance of the transaction resulting from their intent. The resolution of this narrow issue, purely a factual one, must be determined from all the facts and circumstances surrounding the agreement when it was made. 18 Since the petitioners cannot unilaterally effect a different interpretation of the nature of the agreement, but rather are bound by the arm's-length negotiations between parties, respondent contends that we are obligated to follow the so-called Danielson rule [3] in this case because venue for appeal lies in the Third Circuit. See Meyer Mittleman, 56 T.C. 171 (1971). Alternatively, respondent points out that the parties are bound by their written agreements unless they can produce "strong proof" showing that in substance a different result from that specified in the agreement *50 was intended. See Ullman v. Commissioner, 264 F.2d 305 (C.A. 2, 1959), affirming 29 T.C. 129 (1957); Schmitz v. Commissioner, 457 F.2d 1022 (C.A. 9, 1972), affirming 51 T.C. 306 (1968). In this particular situation, whether we apply the Danielson rule, the "strong proof" rule or just the plain weight of the evidence rule, we come inexorably to the conclusion that in both substance and form the agreement of November 18, 1963, was a lease with an option to purchase. A fair inference to be drawn from the 19 facts and from the record as a whole is that the parties got exactly what they bargained for in an arm's-length transaction. Whether from honest bias or obfuscation, the petitioners have tried, albiet unsuccessfully, to make their evidence fit the bed of Procrustes in their effort to transform the lease into a sale. We cannot, like a jinni, cause the realities of the transaction to disappear and find, as petitioners would have us do, that the lease with an option to purchase became an installment sale. *51 In our judgment the record demonstrates two significant conclusions relating to the intent of parties. First, as to Borax, there was no intent other than to enter into a lease. Second, although Reade may have wanted the transaction to be a sale, it knew at the time the agreement was signed that it was entering into a lease with an option available to the lessee to purchase at a subsequent date. And the actions of Reade and its representatives between September 19, 1963, and November 18, 1963, in seeking to induce Borax to change the character of the agreement is persuasive evidence that it was a lease. The Reades wanted to extricate themselves from a portion of their family business because of their advancing ages and diverging interests. Borax wanted to enter what its staff planning group considered to be a burgeoning market ideally suited for their 20 product, expertise, capital and contacts. Both parties had their bargaining goals in mind, but one party was inevitably going to have to compromise. This became obvious when Reade wanted to sell the assets as a group while Borax wanted to lease them with an option to purchase.
Reade wanted to dispose of the herbicide division *52 and did not want to reacquire it. When Borax made its offer in terms of a lease with an option to purchase, Reade was convinced that the option would be exercised. It viewed Borax's product, expertise, capital and contacts as virtually guaranteeing success with the concomitant exercise of the option. The memorandum of understanding signed by both parties following their bargaining session of September 19, 1963, clearly sets forth that Borax was to have a 5-year net lease at $100,000 per year with an option to purchase at the end of 5 years for the sum of $350,000. Thus, Borax was obligated to pay $500,000 to Reade over a 5-year period. The payments were made. However, the option was not exercised and the properties were returned to Reade. Borax agreed to lease the Reade facilities for 5 years while it tested the market to see if it could capture a profitable share of it. This cautious attitude of the Borax officials was not shared by the planning staff which thought the effort would be successful. 21 The original proposal to pay $700,000 with a 3-year lease at $100,000 per year with the option price set at $400,000 was rejected by the Reades. The 5-year lease term *53 and $850,000 price comprised the counterproposal made by the Reades. At all times Borax was unwilling to purchase outright the entire herbicide operation. It required some time in which to determine if they could successfully compete in the application of the herbicides they manufactured. Various reasons have been set forth to explain this reluctance to purchase the assets. These reasons include: (1) Reluctance on the part of the operating personnel to go before their board of directors to get approval; and (2) possible antitrust difficulties and restrictive language in certain long-term financing agreements. Whatever the reasons behind the reluctance of Borax to purchase the assets immediately, the fact remains that it did not want to do so then and it did not. Borax entered into the negotiations certain of what it wanted and flexible as to how much it would pay for it. Borax was advised at each step in the negotiations. It is true that the Borax negotiating team had divergent views, i.e., those of the legal staff which wanted a lease with its attendant effects and those of the advertising staff which wanted to impart the aura of stability to the transaction on the ground *54 that railroads would demand to deal 22 with a company committed to their long-term needs. Hence the legal documents were couched in terms of a lease with an option to purchase while the Borax advertising spoke of assumption of operations. In the negotiations which culminated in the signing of the September 19, 1963, memorandum, Borax was well advised and sure of the effect of its actions. Reade, on the other hand, was acting at that time without the benefit of counsel. The agreement was reached on September 19, 1963, and it was not until October 1, 1963, that counsel for Reade was questioned as to the effect of the transaction. Between October 1 and November 18, 1963, Reade's counsel made concerted efforts to alter the transaction. Reade wanted it to stand scrutiny as a sale. But its counsel then, as now, was confronted with an insurmountable barrier - it was the Reade counterproposal that had been accepted as the terms of the agreement. We have no doubt that Reade's able counsel could have structured the transaction in an advantageous posture if he had been involved in it from the beginning. However, we must accept what was actually done and not what could have been *55 done. The plain fact is that Borax desired a lease with an option to purchase and was able to prevail on Reade to agree. No intimation, much less proof, of any fraud, duress, undue influence or mistake has been shown. 23 Petitioners rely heavily on M & W Gear Co., 54 T.C. 385 (1970), reversed and remanded on other grounds 446 F.2d 841 (C.A. 7, 1971). We think it is distinguishable from the instant case. In M & W Gear Co., supra, both parties orally agreed that the transaction was in actuality a sale in spite of what the documents stated. An internal memorandum set forth therein made it perfectly clear that a purchase was intended by the "lessee." The "lessee" was found to have acquired an equity in the farm and consequently the rental payments were disallowed as deductions. The Court of Appeals, in affirming this Court with regard to the issue of deductibility of the payments, specifically mentioned the internal memorandum of the petitioner company in which the "intention to purchase" the property in question was recognized from the very beginning. This "candidly clear" expression of intention was sufficient to convince the Court *56 of Appeals that a purchase was always intended. No such intention can be drawn from the facts of the instant case. In addition to utilizing intent as a test in an issue of this type, this Court has also examined another norm in order to determine the substance of contracts which are disputed. That norm has been to ascertain whether or not the lessee has acquired or will acquire title to or an equity in the property. This has sometimes 24 been expressed as requiring that the lessee must acquire something of value in relation to the overall transaction other than the mere use of the property. Cf. Judson Mills, 11 T.C. 25 (1948). It is axiomatic that the burden of proving that Borax had acquired an equity in the properties was upon the petitioners. Cf. D. M. Haggard, 24 T.C. 1124 (1955), affd. 241 F.2d 288 (C.A. 9, 1956). We think the petitioners have not only failed in this burden, but also the record shows that Borax never acquired an equity, or anything of value, other than the use of the property. The record clearly reveals that subsequent to the first contact between the Reades and various representatives of Borax, specifically *57 Dibble and Stahler, at which general discussions were had regarding the possibility of Borax acquiring the Reade properties, the real genesis of the negotiations was Cromwell's economic analysis. It was his report which Riemer studied and which prompted him, after a meeting with Cromwell and Stahler, to instruct his delegation to secure a lease-option arrangement. It is likewise clear that one of Cromwell's objectives in recommending a lease-option arrangement was to provide a testing period in which Borax would be able to discern whether or not it could profitably operate the vegetation control business within the Borax organization. Therefore, the fact that Borax wanted a testing period is indicative of the fact that until it was satisfied as to a profitable operation, 25 it had no desire to acquire an equity. Until it was so satisfied it merely desired the use of the facilities. The Reades plainly understood that the proposed transaction did not contemplate a transfer of the equity, but that it would be contingent upon the exercise of the option. This is borne out by the testimony of Charles F. Reade. Cromwell's economic analysis was based upon various assumptions *58 primarily as to the continued use of borates as herbicides, and a projected market price. When these assumptions did not materialize, Borax had the option, envisioned by Cromwell, of returning the facilities back to Reade. In fact, the first two of Cromwell's alternatives in his economic analysis provided for the option to purchase or a forfeiture. When the understanding of September 19 ripened into the contract of November 18, Borax was exactly where it wanted to be, namely, a mere lessee who may exercise its option to purchase, and thus acquire an equity interest. The lease provided that Borax could exercise its option on the annual anniversary date by the payment of a purchase price which would equal the difference between the amount already paid as rent and the overall price agreed upon, namely, $850,000. Thus, at any time within the 5-year period Borax could have acquired an equity. It never chose to do so, however, and when it was 26 determined at the conclusion of the lease term that the operation of the vegetation control business within the Borax operation was not profitable, it chose not to exercise the option. The property then reverted to Reade and, as of the *59 time of trial, Reade still carried some of the facilities on its books. The total rent for 5 years of $500,000 was less than 60 percent of the indicated overall price of $850,000. The balance of $350,000 due upon the exercise of the option at the end of 5 years represented a substantial part of the purchase price. And the amount due at any of the earlier years, if the option had been exercised earlier, would have been more substantial. Thus, it cannot be said here, as it was in Breece Veneer and Panel Co. v. Commissioner, 232 F.2d 319 (C.A. 7, 1956), that the aggregate payments made prior to the exercise of the option would be disproportionate to a relatively small amount required to acquire an equity. Cases in which the courts have found that the lessee was acquiring an equity because of the economic values inherent in the contract are instances where the price to be paid upon the exercise of the option is nominal or small. Cf. Oesterreich v. Commissioner, 226 F.2d 798 (C.A. 9, 1955). In this case the amount of $350,000 was not nominal or small. In our view the yearly payments were a condition to the use of the property. There would be no acquisition *60 of the property until the option was exercised. 27 Petitioners place considerable emphasis on the argument that Article XXI, paragraph 3, of the agreement establishes that Borax was acquiring an equity in the property and relies on this Court's finding in regard to this fact in Franklin Leon Alexander, T.C. Memo. 1958-43, and M & W Gear Co., supra. However, such a provision for the application of annual payments against the purchase or option price at the time the option is exercised has been found to result in rental payments and not installment payments. See Earl L. Lester, 32 T.C. 711, 721 (1959). Accordingly, based on this record, we hold that the payments made by Borax under the lease-option agreement of November 18, 1963, were rental payments taxable to Reade as ordinary income. We therefore sustain respondent's determination. Decisions will be entered under Rule 50. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: Leonard J. Reade and Laurene S. Reade, docket No. 1783-71; Charles F. Reade and Jane B. Reade, docket No. 1784-71; and Charles H. Reade and The Estate of Olive F. Reade, Deceased, Carroll A. Boynton, Executor, docket No. 1785-71. ↩
2. We recognize respondent's aversion to the use of the word "acquisition" with respect to these findings. The term should not be read as a conclusion on our part. The term is correct in the sense that Borax wanted to acquire at least the use of the assets, if not legal title. ↩
3. In Commissioner v. Danielson, 378 F.2d 771 (C.A. 3, 1967), CERTIORARI denied 389 U.S. 858, the Court of Appeals said at p. 775: * * * a party can challenge the tax consequences of his agreement as construed by the Commissioner only by adducing proof which in an action between the parties to the agreement would be admissible to alter that construction or to show its unenforceability because of mistake, undue influence, fraud, duress, * * *. ↩