ESTATE OF JAMES DURKIN, SR., DECEASED, JAMES J. DURKIN, JR., PERSONAL REPRESENTATIVE, AND ANNA JEAN DURKIN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Durkin
Docket No. 47036-86
United States Tax Court
T.C. Memo 1992-325; 1992 Tax Ct. Memo LEXIS 348; 63 T.C.M. (CCH) 3111; June 8, 1992, Filed *348 Thomas W. Ostrander, Mark E. Cedrone, and Joshua Sarner, for petitioners. Linda S. Bednarz and Ruth Spadaro, for respondent. COLVIN
COLVIN
MEMORANDUM FINDINGS OF FACT AND OPINION COLVIN, Judge: Respondent determined deficiencies of $ 75,293 for 1973, $ 244,229 for 1974, $ 4,234,380 for 1975, $ 124,345 for 1976, $ 72,325 for 1977, and $ 95,160 for 1978. Following concessions and a conditional settlement of various issues, the issues for decision are: (1) What was the fair market value of culm banks acquired by petitioners on June 26, 1975? We hold it was $ 7.25 million. (2) Is petitioner Anna Jean Durkin an innocent spouse under section 6013(e)? We hold she is not. Another issue for decision, whether petitioners' acquisition of the culm banks results in a constructive dividend to petitioners, will be decided by separate opinion. All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. TABLE OF CONTENTS Findings of Fact
1. Petitioners' Business Activities: Blue Coal, Raymond Colliery, and Olyphant 2. Anthracite Coal Mining and Culm Banks 3. The *349 United Gas Improvement Corporation -- Blue Coal Agreement 4. Carrier Coal Co. 5. Attempts by Petitioners' Sons and Others to Buy the Blue Coal Culm Banks 6. Boyd Co. Valuation of Truesdale and Wanamie Culm Banks 7. The June 26, 1975, Transactions: Petitioners' Purchase of Culm Banks From GACC and Sale of GACC Stock to Green 8. Truesdale Enterprises and Carrier-Truesdale Partnership 9. Joint Venture with TELCO
10. Developments After June 26, 1975 11. Petitioner Anna Jean Durkin Opinion
1. The Culm Banks: Introduction 2. Fair Market Value of the Culm Banks on June 26, 1975 a. Expert Witnesses b. Business, Financial, and Loan Records c. Comparable Transactions d. Failed Business Theory e. Valuation of Culm Banks -- Conclusion 3. Innocent Spouse FINDINGS OF FACT Some of the facts have been stipulated and are so found. James J. Durkin, Sr., and Anna Jean Durkin (petitioners) resided in Dallas, Pennsylvania, when the petition was filed. James J. Durkin, Sr., died on June 30, 1989. James J. Durkin, Jr., and Edward E. Durkin are petitioners' sons. References to the Durkins are to petitioners and their sons. 1. Petitioners' *350 Business Activities: Blue Coal, Raymond Colliery, and Olyphant
In 1973 Blue Coal Corporation (Blue Coal), including related companies such as Raymond Colliery Co., Inc. (Raymond Colliery), and Olyphant Premium Anthracite, Inc. (Olyphant), was a major anthracite coal production company in northeastern Pennsylvania. Blue Coal, Raymond Colliery, and Olyphant performed deep- and strip-mining operations. a. Raymond Colliery
Raymond Colliery owned all the stock of Blue Coal and Olyphant as of April 1973. Petitioners purchased Blue Coal, Raymond Colliery, Olyphant, and various subsidiaries in November 1973 through a holding company called the Great American Coal Co. (GACC). James Riddle Hoffa (Hoffa), the former general president of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (Teamsters) and James J. Durkin, Sr., sought a $ 13 million loan from the Teamsters' Central States, Southeast, and Southwest Areas Pension Fund (Central States Pension Fund) and the Mellon Bank to finance the stock purchase. On March 10, 1972, the Central States Pension Fund made a commitment to finance the purchase of Raymond Colliery's stock. The commitment *351 letter, to be signed by James J. Durkin, Sr., stated that approximately 96 million tons of culm material, which included the Blue Coal banks, was worth approximately $ 4.3 million, or 5 cents per ton. Hoffa brought Hyman Green (Green), a wealthy entrepreneur, into the transaction because of James J. Durkin, Sr.'s difficulties in obtaining financing. Green sought a loan from Institutional Investors Trust (IIT). IIT wanted a guarantee of the first million dollars as a condition of approving the loan. Green provided that guarantee. On July 24, 1973, IIT gave GACC a commitment for a loan of about $ 8.5 million. Fifty percent of the stock of GACC was issued to Green and 50 percent was issued to petitioners. Between November 1973 and June 26, 1975, petitioners each owned 25 shares of the stock of GACC constituting 50 percent of the total authorized outstanding shares. Green owned the other 50 shares. Hoffa, Green, and James Durkin, Sr., had an understanding under which GACC stock ownership would be 50 percent for Hoffa, 40 percent for petitioners, and 10 percent for Green. This understanding was not carried out because of restrictions imposed by IIT. GACC owned all the stock *352 of Raymond Colliery, which owned all the stock of Blue Coal and Olyphant during all times relevant here. James J. Durkin, Sr. was president and assistant treasurer and Anna Jean Durkin was secretary and treasurer of GACC from April 13, 1973, to June 26, 1975. By July 15, 1974, Green was chairman of the board. James C.B. Millard, Jr. (Millard), Green's attorney, was executive vice president. James J. Durkin, Sr. was a director of Raymond Colliery and president, assistant secretary, and a director of Blue Coal. Anna Jean Durkin was secretary and a director of Raymond Colliery; vice president, secretary, treasurer, and a director of Blue Coal; and secretary of Olyphant. Petitioners received substantial salaries from Blue Coal between November 1973 and June 26, 1975. b. Blue Coal
James J. Durkin, Sr., became president of Blue Coal after GACC acquired Blue Coal. James J. Durkin, Jr. was Blue Coal's vice president. Green initially had little involvement in Blue Coal's operations. c. The Culm Banks owned by Blue Coal, Raymond Colliery, and Olyphant
Starting in the late 1800s, refuse from coal processing in the Northern Field of the Pennsylvania anthracite region was *353 deposited into culm banks. Culm or refuse banks are piles of coal refuse material resulting primarily from underground mining and processing of anthracite coal. Before 1971, Blue Coal, Raymond Colliery, and Olyphant owned numerous culm banks in Luzerne, Lackawanna, Susquehanna, and Wayne counties in Pennsylvania (the Blue Coal banks). These culm banks were created by deep-mining of anthracite coal by the Glen Alden, the Hudson, the Temple Coal Companies, and others beginning around the early 1900s. In 1975, the Blue Coal banks, which are the subject of this litigation, contained between 32 and 50 million tons of gross material. d. Cessation of Operations by Blue Coal
Green, James J. Durkin, Sr., and Gerald Zafft (Zafft), Hoffa's attorney, met from November 1973 through 1975 to discuss how to run the company. By approximately January 1974, Blue Coal, Raymond Colliery, and Olyphant ceased all deep- and strip-mining operations because Blue Coal had been losing a tremendous amount of money. Green wanted to stop the deep- and strip-mining and to liquidate the assets. James J. Durkin, Sr., wanted to continue mining. 2. Anthracite Coal Mining and Culm Banks
a. Pennsylvania *354 Anthracite Coal Mining
The Pennsylvania anthracite region is divided into the Eastern Middle, Northern, Southern, and Western Middle fields. The culm banks at issue here were located in the Northern Field, also referred to as the Wyoming Region. Culm banks are processed by putting culm material through a breaker which separates coal from refuse material. A breaker is a processing plant which separates coal from impurities and sorts coal by size. A dry breaker cleans coal by crushing and screening it. The refuse from dry preparation contains between 50- to 80-percent coal. Wet preparation methods for processing anthracite coal were developed beginning in the 1920s. One example of a wet preparation method, is the "Chance cone" technique which involves floating raw coal in a mixture of sand and water ("heavy media"), where, due to the specific gravity of the mixture, impurities sink and coal floats. Another example is the "Menzie cone" technique. The discharge from the Chance and Menzie cone processes may contain as little as 1 to 5 percent standard anthracite coal, but may contain significantly greater amounts, depending on how the breaker plant is operating. Starting in *355 the 1920s, several coal companies in the Northern Field began to use these new wet preparation techniques. Some companies also used wet preparation processing techniques to reprocess material contained in the dry preparation culm banks. A bank processed in this fashion is "rerun". The coal content of culm banks depends on the production techniques used by the plant that produced the refuse, whether the bank has been rerun, the amount of reprocessing and the degree of burning that has occurred, and the amount of dilution by rock and ash that occurred when the colliery was in operation. Modern coal processing equipment can be used to recover coal from the refuse deposits. There is wide variation in the composition of different culm banks and within a culm bank. The quality of one bank cannot be accurately predicted by extrapolating data from others, and the quality of material in a culm bank cannot be ascertained by looking at it. b. Anthracite Coal Standards and Prices
The Anthracite Committee of the Commonwealth of Pennsylvania established Standard Anthracite Specifications for anthracite coal. These standards are used industrywide to measure the quality of anthracite *356 coal. Coal that meets the Pannsylvania Standard Anthracite Specifications is standard anthracite coal. Coal that meets the Pennsylvania Standard Anthracite Specifications is standard anthracite coal. Coal that does not meet the specifications is nonstandard anthracite coal. The biggest factor that distinguishes standard from nonstandard anthracite coal is the percent of ash. Ash is a noncombustible material inherent in coal. Other factors that determine the quality of coal are the size, the amount of water, and the number of British Thermal Units (BTU's), which shows the burning value of the coal. Nonstandard anthracite coal sells for less than standard anthracite coal. Standard anthracite coal sizes vary from "Broken", which is 4-3/8 inches, to "Buckwheat No. 5", which is 3/64 of an inch. The largest permissible ash content for "Broken" is 12 percent, and the largest permissible ash content for "Buckwheat No. 5" is 17 percent. Anthracite coal with an ash content over 17 percent is nonstandard anthracite coal. The ash content of coal varies if the specific gravity of the heavy media is changed. If ash content is reduced, coal recovery is also reduced because more coal *357 sinks instead of floats in the production process. Preparation plant shipments per short ton (2,000 pounds) of various sizes of Pennsylvania anthracite coal for 1975 realized sales as follows: 1975 Pennsylvania Anthracite Prices
Size
Price
Pea and larger
$ 45.04
Buckwheat No. 1 and smaller
$ 27.61
All sizes
$ 32.26
Total Pennsylvania anthracite production dropped while culm bank production increased between 1972 and 1975. Total Northern Fields
Wyoming Region Anthracite
Anthracite Production
Production from Culm Banks
Year
(Short Tons)
(Short Tons)
1972
1,334,000
177,000
1973
1,011,000
161,000
1974
677,000
435,000
1975
905,000
710,000
Between 1973 and 1975, the price of anthracite coal doubled as a result of several factors: inflation, the release of wage and price controls which had been imposed in 1971, the Arab oil embargo, and severe flooding in the Northern Field from Hurricane Agnes. The fact that Blue Coal ceased production in 1974 may also have temporarily contributed to a price increase in 1974-75. 3. The United Gas Improvement Corporation -- Blue Coal Agreement
The United Gas Improvement Corporation (UGI), a major utility *358 company in the Wilkes-Barre area during the 1960s and 1970s, considered building an electric generating facility using anthracite refuse containing 40-percent ash. On January 14, 1971, Blue Coal granted UGI an option to buy 60 million tons of culm material, which included the Blue Coal banks. The sales price for the culm banks would have been 5 cents per raw ton. The agreement provided for the culm to be acquired over a 10-year period at $ 25,000 per month with no interest. The present value of this purchase price in 1971 was about $ 1.8 million. The UGI-Blue Coal agreement was canceled with the consent of the parties on May 24, 1973, in part due to uncertainties about economies of scale, the coal content of the culm banks, and the ability to obtain proper title insurance. A plant was never built. 4. Carrier Coal Co.
a. Formation and Ownership
Carrier Coal Co., Inc. (Carrier Coal), was incorporated on June 13, 1974. Petitioners' sons were directors and each owned 50 percent of its stock. b. Lease of the Olyphant, Eddy Creek, and Gravity Slope Culm Banks
On June 4, 1974, Carrier Coal leased the Olyphant, Eddy Creek, and Gravity Slope culm banks, surrounding *359 land, and a breaker from Raymond Colliery and Olyphant. The breaker was adjacent to the Olyphant culm bank. The lease operation was successful. Carrier Coal processed material from the Eddy Creek culm bank first because Carrier Coal believed it had the best quality material. Production began from the portion of the bank believed to have the best coal. c. Purchase of the Olyphant, Eddy Creek, and Gravity Slope Culm Banks
From June to August 1974, Carrier Coal showed a profit. As a result, Carrier Coal and petitioners' sons decided to purchase the land, the three culm banks, and the breaker. Petitioners' sons sought financing for this purchase from the Wyoming National Bank of Wilkes-Barre (Wyoming Bank), which in turn sought the participation of the Mellon Bank of Pittsburgh. The Mellon Bank required a geological survey of the economic feasibility of the project. The Mellon Bank referred the Wyoming Bank to the John T. Boyd Co. (Boyd Co.). The Wyoming Bank asked the Boyd Co. to prepare an engineering evaluation of Carrier Coal (the September 30, 1974, Boyd report). The purpose of the September 30, 1974, Boyd report was to give the Wyoming Bank an opinion of the value *360 of the three culm banks to provide a basis for lending the funds. d. The September 30, 1974, Boyd Report on the Eddy Creek, Gravity Slope, and Olyphant Culm Banks
The Boyd Co. was a mining and geological engineering firm with offices in Pittsburgh, Pennsylvania, and Denver, Colorado. John T. Boyd (Boyd) founded the firm in 1943. He was the firm's president in 1975. Boyd had experience in the field of bituminous coal. James W. Boyd, Boyd's son, was a mining engineer with the Boyd Co. in 1975. James W. Boyd is a knowledgeable mining engineer and the author of "Fundamentals of Coal and Mineral Valuations." Before this project, the Boyd Co. had no experience advising clients regarding the sale of anthracite coal or processing anthracite culm banks. Al Gilbert, a vice president of the Boyd Co. in 1975, had much experience in the field of anthracite coal, but not in the reclamation of anthracite culm banks. He participated in preparing the September 30, 1974, Boyd report and the later Boyd report on the Wanamie and Truesdale Banks. Carrier Coal provided estimates to the Boyd Co. that the Gravity Slope, Eddy Creek, and Olyphant culm banks contained a total of 4.1 million gross *361 tons of material. Dale N. Reynolds (Reynolds), an engineering consultant for the Boyd Co., estimated that the three culm banks contained a total of 4,416,277 gross tons of material. Carrier Coal estimated Eddy Creek contained 1 million gross tons and Reynolds estimated it contained 435,600 gross tons. Carrier Coal told the Boyd Co. that its average recovery of coal in September 1974 was 25 percent, based on initial production from the Eddy Creek and Olyphant banks. The records did not indicate the ash content of the coal. The Boyd Co. took one ton of samples of material from each of the Gravity Slope, Olyphant, and Eddy Creek culm banks. Warner Laboratories, a credible commercial laboratory that did coal analysis, tested the samples. Its analysis showed a 19-percent coal recovery at 19-percent ash content. The Boyd Co. used Reynolds' quantity estimates and Warner Laboratories' quality recovery rate to make its valuation. The Boyd Co. extrapolated its results to the untested portions of the banks. Boyd also considered Carrier Coal testing and production statistics. The quality of the material contained in a culm bank can be tested by using core drilling, backhoes, or random *362 sampling. Core drilling is the most accurate of these three methods and random sampling is the least accurate. Carrier Coal paid $ 30,000 for the September 30, 1974, Boyd report. The Boyd Co. arrived on site after August 30, 1974, and completed the report in less than a month. The Boyd Co. told the lending institutions that large areas of the banks were inaccessible for sampling, and variations in the recovery rate could be expected. The Boyd Co. did not include (or believe it was important to include) in its report information about the types of equipment that were used in the breakers that deposited the culm material. The September 30, 1974, Boyd report estimated that the cost of production of a ton of clean coal would be $ 21.55. The report also stated that Carrier Coal's actual cost to produce a ton of coal in 1974 was $ 32.51. The September 30, 1974, Boyd report concluded that it would cost $ 4.25 per ton for hauling charges. The Boyd Co. did not include the cost per mile of hauling refuse from the breaker site back to the culm bank. The September 30, 1974, Boyd report concluded that the average price for which Carrier Coal could expect to sell its coal over the 8-year *363 anticipated life of the project was $ 33.37 per ton. This average price was based on Carrier Coal recovery of 11 to 13-percent ash standard anthracite coal during the initial production runs. Representatives of the Boyd Co. did not review any leases or any other information pertaining to Carrier Coal ownership of the banks. The Boyd Co. valued the Gravity Slope, Olyphant, and Eddy Creek culm banks as of September 24, 1974, at a total of $ 1.155 million. e. The September 1974 Chamberlin Appraisal
Alexander R. Chamberlin (Chamberlin) appraised the value of the Olyphant, Eddy Creek, and Gravity Slope culm banks in September 1974. Chamberlin valued the three culm banks at 20 cents per gross ton and estimated that they contained 2.8 million tons of raw material, for a total value of $ 560,000. Chamberlin took into account that the Olyphant breaker was also acquired and was located next to the Olyphant culm bank. He also estimated that the yield would be between 15 and 20 percent for the Olyphant and Gravity Slope culm banks. The September 23, 1974, Chamberlin appraisal was an appraisal of the assets rather than of an operating company. Chamberlin had access to Carrier Coal's *364 operating information and test results in making the valuation. f. Sale of Culm Banks to Carrier Coal
On September 24, 1974, Carrier Coal agreed to buy property including the Gravity Slope, Olyphant, and Eddy Creek culm banks from Raymond Colliery for $ 840,000. On the same day, Carrier Coal purchased from Olyphant the Olyphant breaker, with 1.3 acres of land for $ 360,000. g. Carrier Coal Financial Records and Coal Production
Carrier Coal generally did not pay a 5-percent broker's commission on its sales. However, Carrier Coal did pay Almar Coal Co. a 5-percent broker's commission from June 13, 1974, to May 31, 1975, except for local deliveries at the breaker. In 1975, Carrier Coal received an average of between $ 48 and $ 50 per ton for the coal it produced. From May 31, 1974, until May 31, 1975, Carrier Coal processed 422,000 tons of refuse material with a yield of standard anthracite coal of 19.8 percent, which it sold for an average of $ 43.79 per ton. Carrier Coal's net income before provision for taxes for its first year of operation (from inception to May 31, 1975) was $ 1,337,023. By early spring 1976, the recovery percentage had fallen dramatically. *365 Carrier Coal could not process a significant amount of material from the other two banks. 5. Attempts by Petitioners' Sons and Others to Buy the Blue Coal Culm Banks
a. James and Edward Durkin's September 1974 Option to Purchase the Blue Coal and Raymond Colliery Culm Banks
After September 1974, petitioners' sons acquired an option to buy all the anthracite culm banks owned by Blue Coal and Raymond Colliery in Luzerne and Lackawanna counties, Pennsylvania, for $ 3.2 million. The culm banks were: Luzerne County
Lackawanna County
West End
Coalbrook Bank
Wanamie
Jermyn Bank Area
Bliss Bank Areas #1
Grassy Island
(Parcels 1 and 2)  Marvine Bank #6
Loomis Bank
City of Scranton (Marvine)
(Parcels 1 and 2)  City of Scranton(Marvine)
Avondale Bank
Northwest Bank
Reynolds Colliery Bank Area
(Parcels 1 and 2)  Huber Colliery Bank Area
Moffet Bank Area
Preston Bank Area
(Parcels 1, 2 and 3)  Preston-Sugar Notch Bank Area
Olyphant Colliery (EC)
Maffetts Bank
Area II (Parcels 1 and 2)   Franklin Bank
Clinton Street Bank
(Parcels 1 and 2)  Powderly Bank Areas
Buttonwood Colliery Bank Areas
(Parcels 1 and 2)  (Parcels 1 and 2)  Truesdale Bank Area No. 1
Baltimore Tunnel Bank
*366 James J. Durkin, Jr., negotiated the $ 3.2 million price with Green and Millard. To finance this attempted purchase, James J. Durkin, Jr., sought a $ 2.7 million loan from the Wyoming Bank, which sought Mellon Bank's participation. Mellon Bank again requested that the Boyd Co. be retained to perform a geological survey of the culm banks. The Boyd Co. submitted a preliminary report on December 18, 1974, and a final report on January 16, 1975 (the January 16, 1975, Boyd report). Petitioners' sons did not acquire the culm banks at this time (as discussed above), because they did not obtain financing. b. Interstate Coal Processing Co. and the Greens
On or about February 18, 1975, petitioners' sons again sought to purchase the culm banks. Certain members of Green's family known as the "Green Group" also attempted to purchase the culm banks through a partnership known as the Interstate Coal Processing Co. (Interstate Coal). The Green Group consisted of the Irving Green Family Trust, Morris Green, Beverly Green Zelman, Ida Lee Green Herman, William H. Green, and James C.B. Millard III, as well as petitioners' sons and others. The ownership of Interstate Coal was to be as follows: *367 James J. Durkin, Jr.
37-1/2%
Edward Durkin
37-1/2%
James C.B. Millard, Jr.
8-1/2% Trustee of the Irving   Green Family Trust   Morris Green
8-1/2% James C.B. Millard III
2% Beverly Green Zelman
2% Ida Lee Green Herman
2% William H. Green
2% It was intended that Interstate Coal would purchase the culm banks from Blue Coal and Raymond Colliery. On February 18, 1975, Interstate Coal agreed to purchase the Blue Coal banks for 10 cents per raw ton. Interstate Coal sought financing from Mellon Bank to purchase the culm banks, but Mellon Bank declined to lend the money. One of the reasons Mellon Bank declined to lend the money, was its fear that the sale of the culm banks to Interstate Coal might be a fraudulent conveyance because the value of the coal reserves had previously been estimated considerably in excess of the $ 3.2 million selling price. Around April 1975, petitioners' sons together with Green and the stock brokerage firm of Donaldson, Lufkin, and Jenrette, unsuccessfully sought to purchase the Blue Coal banks from Raymond Colliery and Blue Coal for 10 cents per ton of culm material. c. Other Prospective Purchasers of the Blue Coal Banks
Green approached *368 several other persons to determine if there was any interest in buying the Blue Coal banks. These persons included Chuck Dewees, Ken Pollack, Fred Davis (Davis), and Louis Beltrami (Beltrami). One such negotiation occurred in February 1975 with Davis. Davis, an acquaintance and business associate of the Durkins, formerly was president of the Reading Trust Co. of Reading, Pennsylvania, and had been involved in the coal business since the early 1970s. He was familiar with the Blue Coal banks. 6. Boyd Co. Valuation of Truesdale and Wanamie Culm Banks
In November or early December 1974, petitioners' sons engaged the Boyd Co. to evaluate the Truesdale and Wanamie culm banks. This was in connection with petitioners' sons' negotiations to purchase the remaining culm banks owned by Blue Coal, Raymond Colliery, and Olyphant, at the request of Mellon Bank. The Boyd Co. prepared a preliminary report dated December 18, 1974, and a final report dated January 16, 1975. Vernon L. Crockett (Crockett), an engineer at the Boyd Co., made a helicopter survey of all the culm banks which were to be purchased by petitioners' sons. Crockett believed that 32 million tons was a low estimate *369 of the quantity of material contained in the culm banks and that the quality of material in the other banks should be better than the Truesdale bank. a. Warner Laboratories Analysis
In December 1974, the Boyd Co. took spot samples from the Truesdale and Wanamie banks and sent them to Warner Laboratories for analysis. On December 9, 1974, the Boyd Co. tested 2,115 tons of spot-sampled material by processing it at the Carrier Coal's breaker in Olyphant, Pennsylvania. The test showed a 15.74-percent recovery rate (333 tons of coal from 2,115 tons processed) at approximately 12-percent ash. The coal recovered included nonstandard anthracite coal. Petitioner's expert, Chamberlin, concluded that the Warner tests showed a recovery of 5- to 6-percent standard anthracite coal. Respondent's expert, Walter W. Kaufman (Kaufman), agreed with Chamberlin's calculation of the percentage of recovery from the Truesdale bank. The January 16, 1975, Boyd report made the following estimates for the Truesdale and Wanamie culm banks: Gross
Refuse
Acres
Quantity
Recovery
Clean Coal
Ash
Pile
(Est.)
Tons (000's)
%
Tons (000's)
%
Truesdale
27
4,000
13.62
544
16.92
Wanamie
18
2,700
19.77
534
55.25
Totals  45
6,700
16.00
1,078
*370 b. Production Costs
Labor costs included in the January 1975 Boyd report were based on actual labor rates supplied by Carrier Coal. The Boyd Co. used an 18-percent discount rate on cash-flow (present value) because the quantity and quality of the culm material was in doubt. The Boyd Co. calculated that it would cost $ 3.42 per clean ton to haul the coal from the Wanamie and Olyphant culm banks by using the cost per ton over the entire amount produced from both the Wanamie and Truesdale culm banks (140,000). The Boyd Co. did not include the cost of borrowed funds, or the costs of a broker to sell the coal. The January 16, 1975, Boyd report concluded that the material processed at the proposed breaker would sell for an average price of $ 45 per ton. This price was based on the Carrier Coal sales prices for material processed and sold from the Olyphant culm bank. Carrier Coal sales prices were based on standard anthracite coal containing between 11- and 13-percent ash. The material from the Truesdale and Wanamie culm banks as reported by the Boyd Co. was not standard anthracite coal and would not command standard anthracite coal prices. The Boyd Co. estimated the net worth *371 of the Truesdale and Wanamie culm banks, as of January 1, 1975, to be $ 3,846,000. Petitioners' sons, through Carrier Coal or the Bancroft Co. Partnership, paid the Boyd Co. for the January 16, 1975, Boyd report. James Durkin, Jr., was satisfied with both the September 1974 and January 1975 Boyd reports because they gave the banks a basis on which to lend the funds. The Durkins gave the Boyd reports to the Wyoming Bank, the Mellon Bank, and Total Energy Leasing Corp. However, petitioners' sons attempts to obtain financing were unsuccessful. 7. The June 26, 1975, Transactions: Petitioners' Purchase of Culm Banks From GACC and Sale of GACC Stock to Green
a. Overview
Green sought to buy the Durkins' stock in Blue Coal on February 27, 1975, for $ 1.205 million and to have the Durkins resign their positions as officers and directors of GACC or its subsidiaries. After several months of negotiations, petitioners agreed to transfer their GACC stock to Green and acquire the culm banks. Petitioners agreed to get out of Blue Coal by transferring their GACC stock to Green, terminating their employment with Blue Coal, and buying the culm banks. On June 26, 1975, petitioners *372 purchased the Blue Coal Culm banks from GACC and sold their GACC stock to Green. This ended petitioners' GACC ownership and transferred coal properties from GACC to petitioners. b. Sale of Blue Coal Culm Banks to the Durkins
In 1975, James J. Durkin, Jr., began negotiating with Green to buy the Blue Coal banks. On May 28, 1975, petitioners agreed to purchase certain culm banks' access easements and a breaker site from Blue Coal, Raymond Colliery, and Olyphant for $ 2.97 million and a $ 1 royalty per long ton (2,240 pounds) of clean coal produced. The May 28, 1975, agreement was superseded by an agreement dated June 26, 1975 (Culm Agreement), and modified on January 28, 1976. In the June 26, 1975, agreement, petitioners purchased the culm banks in issue. The purchase price of the assets sold under the June 26, 1975, agreement was $ 4.17 million and a $ 1 royalty for each long ton (2,240 pounds) of clean coal produced. The $ 4.17 million consideration was comprised of: $254,000  Certified check
400,000
Promissory note
2,333,920
Cancellation of indebtedness by the Durkins
610,000
Assumption of GACC debts by the Durkins
572,080
Promissory note from petitioners, cosigned
$ 4,170,000
by their sons  *373 These banks contained 35 to 40 million tons of material. As part of the June 26, 1975, agreement, petitioners obtained all of the right, title, and interest of Blue Coal, Raymond Colliery, and Olyphant in the following leases: (1) Lease to Beltrami on the Marvine banks; (2) UGI-Pollock and Susquehanna leases; (3) State lease on Powderly bank; and (4) Falzone-Colt lease. In the June 26, 1975, Culm Agreement petitioners did not buy an operating company or equipment. They bought the banks in bulk. Petitioners did not purchase a fee simple interest in the Blue Coal banks and land on which they were situated. Most of the banks were to revert to GACC in 20 years. The June 26, 1975, Culm Agreement differed from the May 28, 1975, agreement in that the purchase price was increased from $ 2.97 million to $ 4.17 million. On June 26, 1975, the Board of Directors of Blue Coal adopted a resolution to convey parcels of land and the culm material in the Counties of Luzerne, Lackawanna, Susquehanna, and Wayne to petitioners. On that date, petitioners, Green, and Millard were the members of the Board of Directors of Blue Coal who authorized the resolution above. c. Sale of Petitioners' *374 GACC Stock to Green
On June 26, 1975, petitioners entered into an agreement to sell their GACC stock to Green for $ 205,000, to cancel all indebtedness owed to them from GACC, and to resign as officers, directors, and employees of GACC and its subsidiaries. On June 26, 1975, petitioners resigned as officers of GACC and its subsidiaries. d. Release of IIT Liens on Blue Coal Culm Banks
IIT held a lien on all of Blue Coal's assets on June 26, 1975, including the Blue Coal banks, and had the right to approve or disapprove of any sale of any asset of the company. To induce IIT to release its lien on the Blue Coal banks, Blue Coal agreed to pay a release fee of $ 1 million. 8. Truesdale Enterprises and Carrier-Truesdale Partnership
a. Assignment of Blue Coal Culm Banks, Etc., to Truesdale Enterprises
Petitioners assigned all of their right, title, and interest acquired under the Culm Agreement in the Blue Coal culm banks to Truesdale Enterprises, Inc. (Truesdale Enterprises). For all times relevant here, Truesdale Enterprises was owned 50 percent by James J. Durkin, Sr., and 50 percent by Anna Jean Durkin. In the January 28, 1976, Modification Agreement, Truesdale *375 Enterprises agreed to reconvey certain land that was unnecessary to provide access to the culm banks. Davis helped the petitioners in their attempt to obtain financing to process the culm banks. In the late summer or early fall of 1975, Davis prepared a loan application for Carrier Coal Co. and Truesdale Enterprises, which were owned 100 percent by petitioners. The application was submitted to First Valley Bank, Wyoming Bank, and Mellon Bank. It was based on the January 16, 1975, Boyd report. The loan application was for a 5-year term loan of $ 4.5 million. The loan application prepared by Davis stated that if the values for the Wanamie and Truesdale banks in the January 16, 1975, Boyd report were applied to what Davis "conservatively estimated" to contain 32 million tons of the culm material, it would result in a present value in excess of $ 18 million. The loan application stated, "If an income approach were used with profit being capitalized at 20%, the projected [annual] profit of $ 2,956,809 would have a capital value of $ 14,784,045." In the application, Davis stated that the culm material could be economically processed from the 2 existing plants in 18 years. Davis' *376 figures were extrapolated from the January 16, 1975, Boyd report. The attempt to obtain financing from First Valley Bank, Wyoming Bank, and Mellon Bank was unsuccessful. b. Carrier-Truesdale Partnership
On January 28, 1976, Carrier Coal and Truesdale Enterprises entered into a partnership known as the Carrier-Truesdale Partnership, which combined all of the assets and liabilities of the two corporations. Carrier Coal was a 60-percent owner of the partnership, and Truesdale Enterprises was a 40-percent owner. Truesdale Enterprises contributed the culm banks that petitioners acquired on June 26, 1975 (the Blue Coal Banks). Carrier Coal contributed the Olyphant, Gravity Slope, and Eddy Creek culm banks, the Olyphant breaker, land equipment, and an operating organization. Carrier Coal's liabilities were $ 5,112,000. In its opening accounting entries, dated January 29, 1976, the Carrier-Truesdale Partnership's basis in the Blue Coal banks contributed by Truesdale Enterprises was $ 4.17 million. 9. Joint Venture with TELCO
a. Total Energy Leasing Corporation (TELCO)
Petitioners needed to raise $ 5.5 million to begin processing the culm banks. Jules I. Whitman *377 (Whitman), an attorney with the Philadelphia law firm of Dilworth, Paxson, Kalish & Levy, represented the Durkins in 1975. In 1975 and 1976, Meyer Steinberg (Steinberg) was the principal stockholder of Total Energy Leasing Corp. (TELCO). In 1975, TELCO had a large expiring net operating loss carryforward. TELCO wanted an investment opportunity which would provide taxable income to use its expiring net operating loss carryforward. TELCO was referred to Richard Levy (Levy) of Dilworth, Paxson, Kalish & Levy. In August 1975, Levy put TELCO in touch with the Durkins to discuss a possible joint venture to produce coal from the Blue Coal banks. b. The Joint Venture: Carrier Coal Enterprise
TELCO and the Durkins agreed to form a joint venture to be called Carrier Coal Enterprises. TELCO joined Carrier Coal Enterprises because TELCO expected it to produce taxable income needed to use TELCO's expiring net operating loss carryforward. Carrier-Truesdale Partnership joined Carrier Coal Enterprises to obtain financing to produce coal from the Blue Coal banks, and to pay existing debts. On August 20, 1975, Whitman sent a proposed joint venture agreement to TELCO. Under the proposed *378 agreement, the Durkins would contribute the culm banks owned by Carrier and those acquired on June 26, 1975, subject to certain liabilities. Either the Durkins or their representatives sent the following documents to TELCO after the joint venture was proposed: the financial statements of Carrier Coal, the September 1974 and January 1975 Boyd reports, and projections of future operations prepared by Charles Parente (Parente), accountant for Carrier Coal. The parties to the joint venture ancitipated that all sales would be direct so the joint venture would not have to pay a 5-percent commission to a coal broker. In a letter to TELCO dated August 20, 1975, Whitman represented that, once the operation of the proposed joint venture was fully underway, the total profits earned each year would be more than $ 4 million before taxes. Neither the Durkins nor their representatives ever indicated to TELCO that there were any inaccuracies in the Boyd reports, the Carrier Coal financial statements, or the cash-flow projections. George Myrtetus (Myrtetus), TELCO's president, does not believe that the Durkins made any specific misrepresentations to TELCO about the deal. In a letter to TELCO *379 dated August 20, 1975, Whitman represented that the culm banks that the Durkins were to contribute to the possible joint venture "for purposes of the agreement * * * would have a net value of approximately $ 10,000,000." Parente prepared cash-flow projections, financial statements, and balance sheets for the proposed joint venture. By letter dated October 2, 1975, Parente sent projections for the proposed joint venture to Myrtetus, which included the following information: ANNUAL PRODUCTION:
PROJECTED
INPUT
TONS FINISHED
COST OF
TONS
PRODUCT
PRODUCTION (Per ton)
Carrier Plant
1,000,000
* 150,000
$ 16.75
Truesdale Plant
900,000
135,000
27.58
Total    1,900,000
285,000
SELLING PRICES (PER TON): 1976
1977
1978
1979
1980
Average
$ 48
$ 49
$ 51
$ 53
$ 55
For the fiscal year ended May 31, 1975, the cost of production per ton for Carrier Coal was $ 14.87 after adjusting production costs for the cost of purchased coal. Parente projected that the net income from the proposed joint venture would be $ 5,694,000, $ 5,575,000, $ 5,720,000, $ 5,805,000, and $ 5,817,000 for taxable years *380 1976 through 1980, respectively. These figures did not take into account interest and debt repayments or income taxes. On December 8, 1975, Parente sent a letter to Myrtetus containing a pro forma balance sheet for Carrier Coal and Truesdale as of October 31, 1975. The pro forma balance sheet listed the value of the culm banks purchased by the Durkins on June 26, 1975, as $ 9,765,793. c. Chemical Bank Loan to TELCO
In 1975 and 1976, TELCO was an active client of Chemical Bank. TELCO applied to Chemical Bank around January 1976 for a $ 5.5 million loan to provide the $ 5.45 million it was to contribute to the proposed joint venture. Steinberg, Carrier Coal Enterprises, TELCO, and the Carrier-Truesdale Partnership were obligated to repay the Chemical Bank loan. The culm banks were used by TELCO as collateral for the $ 5.5 million loan. As a result, Chemical Bank obtained mortgages on Carrier Coal's assets as collateral, including the culm banks. The following things were considered by Chemical Bank in deciding whether to make the loan to TELCO: (1) The Boyd reports, primarily to determine the amount of culm material; (2) cash-flow analysis and actual production from *381 Carrier Coal; (3) the quality of the culm bank material; (4) the reputation of the parties involved and the credibility of the accounting firm employed by the parties; (5) internal cash flow projections; (6) inspection of the culm banks and the processing facilities (Chemical Bank viewed but did not test the culm banks); and (7) the fact that TELCO had net operating losses of at least $ 5 million. Steinberg negotiated the loan on behalf of TELCO, and Joseph A. Lucas (Lucas) and Al Schiavetti (Schiavetti) negotiated on behalf of Chemical Bank. Lucas was a district head in the Commercial Banking Group of Chemical Bank when the loan to TELCO was approved. Schiavetti was his associate. Grover Castle (Castle), a vice president of Chemical Bank's Petroleum and Minerals division, believed the loan involved high risk. However, he approved the loan. In 1975, Chemical Bank had a policy not to lend funds in excess of 50 percent of future net revenues or reserves. Walter E. Seibert, Jr. (Seibert), an engineer and vice president of the Petroleum and Mineral Division of Chemical Bank, believed that the proposed $ 5.5 million loan met this standard. He recommended that Chemical Bank *382 make the loan. A Siebert engineering memorandum dated October 27, 1975, concerning the TELCO and Carrier Coal loan stated that Carrier Coal produced coal containing 13-percent ash, 13,000 B.T.U., and less than 0.7-percent sulfur. Chemical Bank believed that, although the project had been uneconomic a few years earlier, it was feasible in November 1975 because of higher oil prices. Chemical Bank made the $ 5.5 million loan to TELCO for the joint venture. d. Formation of Carrier Coal Enterprises
The Durkins entered into the joint venture with TELCO through the Carrier-Truesdale Partnership. On January 28, 1976, the Carrier-Truesdale Partnership formed a joint venture with TELCO, known as Carrier Coal Enterprises. Carrier Coal Enterprises was owned 50 percent by the Carrier-Truesdale Partnership and 50 percent by TELCO. Upon formation of Carrier Coal Enterprises, TELCO contributed $ 5.45 million and the Carrier-Truesdale Partnership contributed culm banks, a processing plant, and miscellaneous equipment. The Carrier-Truesdale Partnership's basis in all of the culm banks it contributed to Carrier Coal Enterprises was $ 4,743,955. The Carrier-Truesdale Partnership's basis *383 in all of the assets it contributed to Carrier Coal Enterprises, including the land, breaker, and equipment, was $ 5,370,180.94. The Carrier-Truesdale Partnership also contributed $ 5,112,000 in liabilities which were assumed by Carrier Coal Enterprises. The basis of Carrier-Truesdale Partnership's (total) net contribution to Carrier Coal Enterprises was $ 258,180.94. As listed on the pro forma balance sheet at the inception of the Carrier-TELCO venture, the book value was $ 573,955 for the culm banks contributed to the joint venture by Carrier Coal and $ 4,170,000 for the culm banks contributed by Truesdale Enterprises. The value of the culm banks is listed as an asset at a value of $ 9,765,793. Parente sent a letter to Levy dated December 26, 1975, with various documents relating to the joint venture. Those documents included a "Pro-Forma Balance Sheet at Inception of Venture" and a "Calculation of Book Basis of Assets Sold", which each list the culm banks at a value of $ 9,868,990. Parente prepared the 1976 partnership return for Carrier Coal Enterprises. The book value assigned to the bank material owned by Carrier Coal Enterprises on that return was $ 4,743,955, and the *384 market value assigned to the total bank material contributed by Carrier-Truesdale Partnership was $ 9,935,774. The Carrier Coal Enterprises financial statements for the period January 28, 1976 (inception) to December 31, 1976, prepared by Laventhol, Krekstein, Horwath & Horwath on April 21, 1977, list the value of the culm banks as $ 10,231,036. The Carrier Coal Enterprises' unaudited financial statements from January 28, 1976 (inception), to December 31, 1976, and years ended December 31, 1977, and 1978, and 9 months ended September 30, 1978, and 1979 show the culm banks at a value of $ 10,175,036. e. The Operation of Carrier Coal Enterprises
Carrier Coal Enterprises fell short of expectations soon after it was formed. The Chemical Bank loan went bad (became a "non-performing asset") almost immediately. There was insufficient cash-flow to service the loan. Starting around April 1976, Chemical Bank began pressuring Carrier Coal Enterprises to sell its assets to service the debt. On August 11, 1976, Carrier Coal Enterprises agreed to sell all the culm material in the West End culm bank, approximately 3.5 million to 4 million tons, to West End Coal Co., for $ 2.5 million. *385 The buyers paid a $ 200,000 deposit, but the balance was never paid. In October 1976, Carrier Coal Enterprises entered a contract to provide 25,000 to 30,000 tons of coal at $ 23.33 per ton. Carrier Coal Enterprises estimated its loss to be $ 253,000 on this contract. Carrier Coal Enterprises was unable to profitably produce coal from the Blue Coal banks, and lost about $ 1,432,136 from its inception to December 31, 1976. The market for coal had deteriorated significantly and the plant was inefficient. As a result of Carrier Coal Enterprises' lack of profit, the partners defaulted on a long-term obligation that Carrier Coal Enterprises had guaranteed. Around May 1977, Myrtetus' office prepared a "Business Plan" to be submitted to Chemical Bank, which explored possible plans to process the culm material. The business plan states that the culm banks contain over 40 million tons of material with an estimated 19-percent marketable coal. The business plan proposes, as part of "Plan III", the erection of two precleaning plants to be used with the existing processing plant to produce 305,760 tons of marketable coal per year. The plan projects a cost of $ 13.49 per ton and a sales *386 price of $ 36.10 per ton. In 1977, James J. Durkin, Jr., as managing partner of Carrier Coal Enterprises, represented that the culm banks contained (conservatively) over 36.4 million tons of material. He stated that he guaranteed that 6 million tons of anthracite were contained in the culm banks, not including silt. He estimated that the coal contained in the culm banks owned by Carrier Coal Enterprises could be sold for $ 42 per ton. Carrier Coal Enterprises suspended operations in 1977, due to heavy production losses. 10. Developments After June 26, 1975
Culm bank production in all of Pennsylvania fell from about 2.9 million tons in 1975 to about 1.5 million tons in 1978. This occurred when production from Pennsylvania deep coal mining was at its lowest historical level. Since 1975, the Wanamie, Truesdale, Huber, Powderly, Bliss, and Marvine banks have been rerun. The Gravity Slope and Eddy Creek banks have been processed, but the Olyphant bank has not. Beltrami has processed several of the Blue Coal banks, and has never recovered more than 8- or 9-percent coal. Recovery of low ash coal was between 5 and 6 percent. Since 1975, the companies that reran these banks *387 have gone out of business. 11. Petitioner Anna Jean Durkin
Anna Jean Durkin married James J. Durkin, Sr. (Mr. Durkin) on August 17, 1937. They were married until his death on June 30, 1989. Mrs. Durkin had a good style of living before and during her marriage. From 1973 until 1978, petitioners lived in a large, beautifully decorated English manor house. Mrs. Durkin had maids and cooks before and after she married. Mr. Durkin owned or leased Cadillacs since the 1940s, including from 1973 to 1978. Mrs. Durkin owned or leased a Lincoln Continental from 1973 through 1978. Mr. Durkin did not like to travel. He and Mrs. Durkin did not take vacations together from 1973 to 1978. Mrs. Durkin traveled with her daughter. Around 1936, Mrs. Durkin inherited stock from her grandmother. Mrs. Durkin managed that stock. Mrs. Durkin also received an inheritance from an aunt who passed away. The inheritance included real estate, stock, and bonds. Mrs. Durkin managed those assets. Mrs. Durkin graduated in 1937 with a bachelor or arts degree from Mount Holyoke College with a major in mathematics. She took accounting courses and attended law seminars in New York City during World *388 War II. In 1946, she passed examinations for insurance and real estate licenses. Mrs. Durkin is listed in Who's Who of American Women and World's Who's Who of Women. Mrs. Durkin handled all of her own finances and kept them separate from Mr. Durkin's finances. She also wrote all the checks pertaining to her joint finances with Mr. Durkin. At a time not stated in the record, Mrs. Durkin was an executive of and active in Connell Coal Co. Connell Coal was built to clean old culm banks and sell the material to power plants. It was a highly profitable venture. The company purchased additional banks, and sold them at a sizeable profit to UGI. At a time not stated in the record, Mrs. Durkin was a stockholder of Honeybrook Mines, Inc., a sizeable deep-mining and stripping operation. Also, at some time not stated in the record, Mrs. Durkin was secretary, treasurer, and office manager of Dart Coal Co., Lyon Coal Co., Lark Coal Co., and Almar Coal Co., and the treasurer of Great West Coal Sales Co., New York City. Petitioners were the sole partners in the Almar Coal Co. Mrs. Durkin became Budget Director of Pocono Downs, Inc., a harness racing track in 1965, and she became executive *389 vice president about 2 years later. In this capacity, she supervised the accounting department, headed the purchasing department, and checked on all phases of management. At some time not stated in the record, Mrs. Durkin was secretary of National Diversified Industries until it was merged with a meat packing company. Mrs. Durkin has managed or has been active in all Durkin Enterprises projects. Parente often dealt with Mrs. Durkin. Sometime before the years in issue, Durkin Enterprises purchased 30,000 acres of anthracite coal in Center County near Snowshoe, Pennsylvania. This land was valuable for its fuel assets, and also had potential for real estate development. Several large companies had options to drill for gas. Mrs. Durkin managed this operation. She let leases for mining, stripping, hunting, areas, timber, clay, and others. As of November 1973, petitioners jointly owned 33-1/3 percent of the stock of Barbara Coal Co. (Barbara Coal), and petitioners' sons each owned 33-1/3 percent of the stock. Barbara Coal was involved in mining and stripping operations. Mrs. Durkin was vice president and director of Barbara Coal. Mrs. Durkin resigned as secretary and treasurer *390 of Barbara Coal on February 18, 1974, but she remained as vice president, director, and shareholder. Mrs. Durkin was vice president, secretary, and a director of Raymond Colliery. Mrs. Durkin was director, vice president, and secretary of Blue Coal. She was present at the closing when the Durkins purchased Blue Coal in November 1973. She received a $ 28,750 salary from the Blue Coal in 1974 and $ 16,034.46 in 1975. Mrs. Durkin spent 1 to 3 days per week in the Blue Coal offices between 1973 and 1975. Some weeks she did not go to the Blue Coal offices. Mrs. Durkin had her own office at Blue Coal. It had previously been occupied by the former comptroller of the company. Mrs. Durkin told Frank Dougher (Dougher), comptroller for Blue Coal, which Blue Coal bills to pay, or they decided together which bills to pay. Dougher talked with Mrs. Durkin every day she was in the Blue Coal offices. While Mrs. Durkin was working at the offices of Blue Coal, if she had any typing, it was done by Gordie Thomas, the president's secretary. Mrs. Durkin dealt with people seeking to buy equipment and leases for the right to mine coal on Blue Coal property. She told Dougher to lay off several *391 Blue Coal employees. On July 1, 1974, Mrs. Durkin signed a Blue Coal memo granting all administrative and office personnel extra holiday time for the 4th of July holiday between July 3, 1974, and July 8, 1974. During most of the years at issue, Mrs. Durkin also had an office in her home in Dallas, Pennsylvania. Mrs. Durkin had a secretary named Carol in Dallas, Pennsylvania. Mrs. Durkin had Carol call Dougher at the offices of Blue Coal to give him instructions regarding work to be performed. Mrs. Durkin was secretary and director of GACC. On May 28, 1975, petitioners signed a letter agreeing to dispose of all their GACC stock. On June 26, 1975, petitioners disposed of their GACC stock and canceled the GACC indebtedness of $ 2,333,920. Mrs. Durkin was secretary and director of Truesdale. She kept all the Truesdale books. She supervised the daily accounting and office work of Truesdale, attended numerous meetings, and cosigned all checks. Mrs. Durkin also helped supervise and formulate the budget for Truesdale and Carrier Coal Enterprises and consulted with Carrier Coal officers on ways to cost cuts. On June 26, 1975, petitioners and their sons executed promissory notes *392 on behalf of Truesdale in the amounts of $ 505,473.77 and $ 400,000. Mrs. Durkin was not involved in arranging the loan from Chemical Bank. Mrs. Durkin received salaries from Truesdale in the amounts of $ 16,253.98 in 1975, and $ 1,333.33 in 1976. She received salaries from Carrier Coal in the amounts of $ 25,333.27 in 1976, $ 39,666.64 in 1977, and $ 25,000 in 1978. OPINION We must decide the amount and character of petitioners' gain, if any, from the transaction in which petitioners' acquired culm banks on June 26, 1975, and whether Mrs. Durkin is an innocent spouse under section 6013(e). 1. The Culm Banks: Introduction
Respondent contends that petitioners received a $ 5,765,774 constructive dividend in 1975 resulting from their purchase of culm banks on June 26, 1975. Respondent contends that petitioners purchased the culm banks for much less than their fair market value and that the bargain purchase resulted from petitioners' control over GACC. Respondent asserts that the fair market value of the culm banks on that date was $ 9,935,774 and the purchase price was $ 4,170,000. Respondent's position is based largely on expert opinion and petitioners' business and *393 loan-related documents. Petitioners dispute respondent's contentions relating to the fair market value, the presence of control, whether the culm bank sale was separate from petitioners' sale of GACC stock to Green, and respondent's characterization of the transaction. Petitioners contend that business records on which respondent relies were not intended to show the fair market value of the culm banks, that business records and expert opinions support petitioners' position, and that respondent's position fails to take into account various points relating to fair market value. Respondent's determination is presumed to be correct, and petitioners have the burden of proving it to be in error. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). 2. Fair Market Value of the Culm Banks on June 26, 1975
Fair market value is "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having a reasonable knowledge of relevant facts." Sec. 1.170A-1(c)(2), Income Tax Regs.; see 551 United States v. Cartwright, 411 U.S. 546, 551 (1973) (re *394 sec. 2031). Fair market value is a question of fact to be determined from the entire record. Lio v. Commissioner, 85 T.C. 56 (1985), affd. sub nom. Orth v. Commissioner, 813 F.2d 837 (7th Cir. 1987). Fair market value is a question of judgment rather than mathematics. Hamm v. Commissioner, 325 F.2d 934, 940 (8th Cir. 1963), affg. T.C. Memo. 1961-347. By its very nature, valuation is an approximation derived from all the evidence. Helvering v. Safe Deposit & Trust Co., 316 U.S. 56 (1942); Silverman v. Commissioner, 538 F.2d 927, 933 (2d Cir. 1976), affg. T.C. Memo. 1974-285. a. Expert Witnesses
Each party relied on two expert witnesses in support of the respective culm bank fair market value positions. The opinions of expert witnesses are weighed according to the experts' qualifications and other relevant evidence. See Johnson v. Commissioner, 85 T.C. 469, 477 (1985); Anderson v. Commissioner, 250 F.2d 242, 249 (5th Cir. 1957), affg. T.C. Memo. 1956-178. We may accept or reject expert *395 testimony according to our own judgment, Helvering v. National Grocery Co., 304 U.S. 282 (1938), and we may be selective in deciding what portions of an expert's opinion, if any, we will accept. Parker v. Commissioner, 86 T.C. 547, 562 (1986). Respondents' experts were Kaufman and David Jeffreys (Jeffreys). Petitioners' experts were Chamberlin and Louis Beltrami (Beltrami). For reasons stated below, we rely most on Kaufman's and Chamberlin's opinions. (1) Kaufman
Kaufman's opinion is that the fair market value of the culm banks purchased by petitioners on June 26, 1975, was between $ 8.5 and $ 9 million. We found Kaufman to be very qualified and credible. Kaufman's expertise is clear because of his educational background, employment and engineering experience, professional affiliations, and authorship of numerous mining publications and articles. Kaufman used the capitalization of income approach (income approach) to value the Blue Coal banks. He estimated the fair market value of the present worth of the projected income stream to be derived from future sales of the natural resource. This method is one of those generally used *396 by the industry to evaluate natural resource property. Kaufman considered four general factors: (1) The quantity of the reserves; (2) the quality of the reserves; (3) the marketability of the coal produced; and (4) the cost of producing the coal. Kaufman estimated that the Durkins purchased 40 million tons of culm material on June 26, 1975. He erroneously counted the Eddy Creek culm bank which on our record had previously been sold to petitioners' sons. Kaufman estimated that the culm material contained an average recovery of at least 15-percent marketable coal. He considered data from a 1954 assessment of the culm banks owned by the Glen Alden Coal Co., tests conducted by Pennsylvania State University, Boyd Co. reports prepared in 1974 and 1975, actual production statistics from Carrier Coal, and a report published by the Economic Development Council of Northeastern Pennsylvania. From this data Kaufman estimated recovery to be in the 15- to 30-percent range. Kaufman believed that six million tons of coal could be produced from the culm banks and sold for an average of $ 38.50 per ton. Between 1973 and 1975 the price of standard anthracite coal virtually doubled. This was *397 due to several factors including: (1) Wage and price controls were released in late 1973 and early 1974; (2) flooding resulting from Hurricane Agnes in 1972 caused many deep mines to close; and (3) an Arab oil embargo occurred between October 1973 and April 1974. Kaufman developed a hypothetical mining program to process the culm material purchased by petitioners. Kaufman proposed that plants be constructed to process the material. He estimated production of 300,000 tons of coal per year for 20 years. The January 16, 1975, Boyd report also proposed building new coal processing plants. We also note that a loan application prepared by Davis around October 1975 proposed processing more than 1 million tons per year for 18 years. Kaufman estimated the cost of producing coal from the Durkin culm banks in 1975. He estimated costs for a variety of factors such as labor, equipment, hauling, a 10-percent contingency factor, and royalty payments. Kaufman applied a present worth factor of 18 percent to the projected cash-flow for each year. Kaufman said this took into account the high interest rates in 1975, the high risk of developing culm banks, and the uncertain economy. Petitioners *398 fault Kaufman for omitting and underestimating costs. For example, petitioners argue that he omitted coal broker costs. However, a company producing from these culm banks may broker its own coal as was contemplated in the Carrier Coal joint venture. Petitioners fault Kaufman for not considering Office of Surface Mining taxes. However, they were not imposed until 1977, and could not have been considered in valuing an asset on June 26, 1975. Kaufman admitted that his analysis was not perfect. Kaufman's report had some problems that require us to reduce his fair market value estimate. Examples of these are his failure to consider whether environmental or zoning problems could arise from relocating the plant; some costs of real estate and excise taxes; commissions; the extent to which he was considering standard or nonstandard coal; his inclusion of the Eddy Creek bank; and his failure to allow for the $ 1 per ton royalty to be paid by petitioners. (2) Jeffreys
Jeffreys was employed by respondent as a Valuation Engineer at the time of trial. He had been an employee of the Internal Revenue Service since 1972. He used the market method to estimate the value of the culm banks. *399 He evaluated sales of properties he believed to be comparable and applied these prices to the resource to be valued. Jeffreys estimated the culm banks to have a fair market value on June 26, 1975, of $ 10,114,200. Jeffreys has considerably less relevant expertise than Kaufman, Chamberlin, and Beltrami. His academic, employment, and publications background also detract from the weight we give his opinion. His report was more of a summary of respondent's position based on selective references to the facts and published material than the application of independent expertise. We also note numerous flaws in his analysis. For example, in reaching his fair market value figure, Jeffreys identified a February 1973 contract between DeVault Contracting Co., Inc., and Blue Coal for gross fill material. Jeffreys failed to identify the quantity of the purchase, from which culm bank the material came, and the proximity of the bank to the location needing filling. Even though the culm bank sale was not a lease, Jeffreys identified various leases from Blue Coal to third parties to support his valuation. Jeffreys failed to consider that one generally will pay more for a stripping lease because *400 the amount and location of the coal in the coal veins is accurately documented. Although agreeing with the statement that to understand the composition of a culm bank one needs to know the type of equipment that deposited the material on the bank, Jeffreys did not know what equipment was used to deposit the Blue Coal banks. Jeffreys noted that culm bank material could be used for highway construction, building blocks, antiskid material, raw material for the mineral wood industry, soilless media for plant growing, and recovery of mineral and trace elements. However, he failed to identify what companies were involved in these processes or the price that they would pay for the refuse. Although he used the term mineral wood in his report and in his testimony, it appears that his reference should have been to mineral wool. Accordingly, we do not give his report much weight. (3) Chamberlin
Chamberlin, one of petitioners' experts, valued the Blue Coal banks at 3 cents per gross ton. He has solid credentials based on his long experience in the field. Chamberlin is a registered professional engineer in Pennsylvania, and a member of various local and national engineering societies. *401 He has been extensively involved in the Pennsylvania coal industry from before 1945 to the present. He has been a coal broker, managed mines, managed and rebuilt preparation plants, was a partner in a company that operated a silt bank, and since 1957 has owned a mining and machinery company. Since 1975, Chamberlin has appraised approximately 20 coal mine properties and advised people about leases, volumes (as opposed to values), recovery rates, and the processing of culm banks. Chamberlin used the market approach to valuation. His valuation was predominately based upon an analysis of the UGI-Blue Coal agreement as a comparable sale. The UGI transaction was the issuance of an option to UGI from Blue Coal to buy 60 million tons of culm banks for 5 cents per ton. The option was not exercised for many reasons, including the large size of the deal, the inability to obtain proper title insurance, and the uncertain coal content of the banks. In addition, the UGI transaction was negotiated in 1971, 4 years before petitioners' purchase, when the price of coal and culm activity in the area was substantially lower. We do not give this unexercised option much weight as a comparable sale. *402 See M & W Gear Co. v. Commissioner, 446 F.2d 841, 845 (7th Cir. 1971), affg. in part and revg. in part 54 T.C. 385 (1970). Chamberlin's testimony was undocumented, overzealous, and vague in parts. We think his analysis that the culm banks contained nonstandard anthracite coal is oversimplified in parts. Chamberlin agreed that there is a market for nonstandard anthracite coal and the quality of coal can be increased through processing. In addition, Blue Coal and Carrier Coal were processing banks profitably. Carrier Coal's records do not show ash content, but their sales prices suggest it was standard anthracite. Chamberlin failed to adequately distinguish between high and/or low quality nonstandard anthracite. Chamberlin's September 1974 report is inconsistent with the report he submitted in this case. In his September 1974 report, he estimated the value of the Olyphant, Eddy Creek, and Gravity Slope culm banks to be 20 cents per gross ton, compared to a 3 cents per ton estimate in this case. In the September 1974 report, he estimated that the yield would be between 15 and 20 percent for the Olyphant and Gravity Slope culm banks. He testified *403 at trial that he meant this to be about 5-percent standard and 10- to 15-percent nonstandard anthracite coal. This testimony appears to be a farfetched attempt to harmonize inconsistent conclusions. It appears that Chamberlin was excessively concerned with supporting his client's position in one or both of those reports. Chamberlin testified that he knew the history of the Blue Coal banks and the types of equipment used to produce them. However, his testimony on this point appeared glib and overstated to us. Chamberlin testified that he usually relied upon a mineral economist, but there is no evidence that he did so here. However, we believe that he is correct in pointing out some of Kaufman's shortcomings. We also believe that he is correct in taking into account the $ 1 per ton royalty payments to be paid by petitioners. Under the Culm Agreement, petitioners agreed to pay $ 4.17 million plus $ 1 royalty per net ton for all clean coal produced. Chamberlin considered the $ 1 per ton royalty as an additional cost to be borne by petitioners dependent on the amount of coal produced. For example, he calculated royalties of $ 6 million if, as estimated by Kaufman, 6 million tons *404 were produced. (4) Beltrami
Beltrami was an expert witness for petitioners. He valued the Blue Coal banks at 10 cents per gross ton. Beltrami is not an engineer or appraiser, but he has more than 20 years of experience in the coal industry. He has been an employee of, and the owner and operator of coal companies, such as Beltrami Enterprises, that have processed culm banks. In 1975 and 1976, Beltrami Enterprises was one of the largest anthracite coal producers in the United States. Since 1972, Beltrami has invested over $ 40 million dollars in the coal business. Beltrami had inspected culm banks as early as 1974, and was familiar with the Blue Coal banks. He was involved in testing culm banks in 1974 and 1975 to determine their quality. However, on balance, we give little weight to Beltrami's opinion. He has known petitioners for a long time. He has much practical experience in the coal producing business, but his report consisted primarily of conclusionary language which lacked background analysis and detail, and was not fully documented. He also testified that his valuation date was 1990, rather than June 26, 1975. b. Business, Financial, and Loan Records
*405 Respondent contends that petitioners' business and financial records and documents related to various loans and loan applications support respondent's position as to fair market value of the culm banks. Petitioners argue that the business records upon which respondent relies were not intended to represent the fair market value of the culm banks, and respondent's reliance on the Boyd reports was improper. (1) The John T. Boyd Co. Reports
Petitioners retained the Boyd Co. to prepare reports evaluating some of the culm banks at issue. We find the Boyd reports to be generally credible. Boyd testified that more time and more money spent on a report would provide for a more thorough and, we presume, more accurate test. The Boyd reports have limitations. The reports are overly optimistic in places and overstate the value of the culm banks. However, we conclude that the Boyd reports are credible because of their lack of bias, the credentials of those involved in their preparation, and reliance on the reports by lending institutions and prospective business partners. Chamberlin sought to discredit the January 16, 1975, Boyd report through his testimony that 97 tons of oversized *406 material was discarded, thus leading the report to overstate the coal recovery from the tested sample. In contrast, Kaufman said the proper interpretation of the test results is that the oversized material was crushed or broken into smaller pieces. We are not convinced by Chamberlin's criticism of the Boyd report on this point. The January 16, 1975, Boyd report valued only 2 of the more than 30 culm banks in issue in this case. Petitioners argue that extrapolation of data from some culm banks to the remaining culm banks is improper, and Boyd and experts for both parties agreed. Yet, both sides did so. For example, petitioners relied on the Boyd reports in seeking loans from banks for Carrier Coal and Truesdale prepared by Davis and in the TELCO joint venture. The January 16, 1975, Boyd report concludes that the banks contained nonstandard anthracite coal, while the valuation in the reports is based upon standard anthracite coal. Petitioners argue that the Boyd reports are invalid because they value an operating corporation. We disagree. The Boyd reports valued culm banks using an income method similar to that used by Kaufman. The Boyd reports were not completely accurate. *407 However, they generally lend support to respondent's position as to fair market value of the culm banks on June 26, 1975. (2) Carrier-Truesdale Partnership Outline, Financial Statements, Balance Sheets, and Boyd Reports to TELCO and Chemical Bank
The attorney for the Carrier-Truesdale partnership prepared an outline that estimated the culm banks had a value of about $ 10 million. He also submitted financial statements, a pro forma balance sheet of the proposed joint venture, and the Boyd reports to TELCO and Chemical Bank. The balance sheet prepared by Parente listed the culm banks as a $ 9,765,793 asset. When the Carrier Coal Enterprises joint venture was proposed in August 1975, petitioners or their representatives presented to TELCO several documents that indicate the true value of the culm banks to be substantially that which respondent determined. Petitioners argue that TELCO sought to join the partnership to use TELCO's net operating losses to minimize TELCO's profit objective and TELCO's reliance on profit projections provided by the Durkin interests. We disagree with this view. We are persuaded by indications that TELCO approached the partnership with every expectation *408 of profit. Petitioners sought to portray the $ 5.5 million Chemical Bank loan to TELCO as a favor for a good customer, and not as a loan objectively considered on its merits. We disagree with petitioners' characterization of Chemical Bank's decision making. (3) Carrier Coal Enterprises' Income Tax Returns
Parente prepared the Carrier Coal Enterprises' corporate income tax return in 1976 which stated a $ 9,935,774 market value for the culm banks. At trial Parente denied that $ 9,935,774 amount was intended to represent the fair market value of the culm banks. Petitioners contend that the $ 9,935,774 amount was a plug number used to balance the partners' capital accounts at 50 percent. Petitioners note that the Carrier-Truesdale partnership contributed all of its assets including the culm banks and $ 5,112,000 in liabilities for a net of $ 258,186.94 while TELCO contributed approximately $ 5.5 million. Petitioners also argue that the $ 9,935,774 amount represented the Carrier-Truesdale partnership's basis in the banks ($ 4,743,955) plus an amount petitioners labeled excess ($ 5,191,819.06). Petitioners define excess as the total assigned value of the Carrier- Truesdale *409 Partnership's capital account ($ 5,450,000) minus the difference between the book value of the assets transferred less the liabilities assumed ($ 258,280). Petitioners view the excess as goodwill. They defined goodwill as an additional cost of the culm banks. Thus, petitioners' $ 4,743,955 basis in the banks, plus the $ 5,191,819.06 additional cost of the banks equals $ 9,935,774.06. Consequently, we conclude that the $ 9,935,774 amount was not a plug number, but rather an expression of the value of the culm banks. We find that Carrier-Truesdale partnership and TELCO entered into their agreement at arm's length, and desired a 50-50 partnership based on equal contributions. Thus, we conclude that the parties contributed equal value. It follows that the so-called plug figure represents what the parties believed the culm banks' value to be. The Carrier Coal Enterprises report that the culm banks had a market value of $ 9,935,774 is consistent with this conclusion because petitioners' business records of the culm banks indicate their $ 4,743,955 basis plus $ 5,191,819.06 additional cost equals $ 9,935,774.06. (4) Loan Application
Davis prepared a loan for petitioners based *410 on the Boyd reports, cash-flow projections, financial statements prepared by petitioners' accounting firm, and other information. The application was submitted to First Valley Bank, Wyoming Bank, and Mellon Bank around October 1975. The application stated that an estimated 21 million tons of culm material could be processed from the 2 existing plants in 18 years. The application estimated the present value of the culm material to be more than $ 18 million. These documents support respondent's position. Petitioners argue that the inability of petitioners and their sons to obtain financing from Pennsylvania banks shows the low value of the culm banks. We disagree. First, on March 13, 1975, the Mellon bank gave as a reason for its refusal to lend money that the transfer was a potential fraudulent conveyance because the banks had been estimated to have a higher value, and the parties (Durkin and Green and Interstate Coal (James and Edward Durkin and Green)) were related. Second, petitioners did not have a firm contract to purchase the output of the breaker to be built. Third, there are many reasons in addition to the value of the culm banks which determine whether it is a sound *411 loan, such as the business experience and credit history of the borrowers. (5) Carrier Coal Enterprises Financial Statement
The accounting firm of Laventhol, Krekstein, Horwath & Horwath prepared a financial statement for Carrier Coal Enterprises which states, "Culm banks (estimated at 36,800 long tons) [=] 10,231,036." Petitioners argue that the $ 10,231,036 figure was used to balance the capital accounts, and not intended to represent fair market value. We disagree for reasons stated above. (6) Carrier Coal Enterprises' Business Plan
Carrier Coal Enterprises prepared a business plan in May 1977 which indicates that the market value of the culm material was more than $ 280 million. However, petitioners did not sign it, and we do not consider it here. (7) Telexes
Respondent argues that in a telex sent on June 19, 1977, James J. Durkin, Jr., represented that the culm banks contained over 36.4 million tons of material of which 6 million tons were guaranteed to be marketable anthracite. In a telex sent on June 20, 1977, over James J. Durkin, Jr's. signature, the coal was estimated to be salable for $ 42 per ton. James J. Durkin, Jr., testified that those telexes *412 were sent by Myrtetus and that he disagreed with them. His denials appear to be a self-serving attempt to contradict business records. (8) Teamsters Commitment Letter
The commitment letter to be signed by James J. Durkin, Sr., stated the value of 96 million tons of culm material was 5 cents per ton. We disregard this document because it was not signed by James J. Durkin, Sr., and it refers to significantly more material than the culm banks in issue. Overall, we believe that the business and financial records support respondent's position. c. Comparable Transactions
For reasons discussed above, we do not consider the UGI transaction as a comparable sale. We note that the Jeffreys expert report offers several culm bank transactions as comparable sales. The prices range from 20 cents to $ 1.79 per ton. The transactions all involve leases, and none involve the large quantity at issue here. We are not convinced that those transactions are sufficiently similar to consider here as comparable transactions. d. Failed Business Theory
Petitioners argue that the business failure of Carrier Coal Enterprises shortly after the culm bank transaction is proof that the culm *413 banks are worth far less than respondent contends. They argue that no one ever made any money processing the culm banks. Petitioners did not provide records or documents to corroborate much of this theory. We are also not persuaded that the value of the culm banks was the sole or major cause of the business failure. Accordingly, we do not give Carrier Coal Enterprises' business failure much weight as evidence of the earlier value of the culm banks. Petitioners cite the testimony of John Sgarlett relating to the sale of Truesdale stock to show its lack of value. Sgarlett was a longtime friend and business associate of the Durkins. We are not convinced by his testimony because of the lack of corroborating documents. For example, petitioners did not produce any sales agreement for the stock, indication of Truesdale's assets at the time of the sale, or proof of the value of Cavanaugh stock. e. Valuation of Culm Banks -- Conclusion
Petitioners contend that respondent improperly failed to consider the fact that petitioners agreed to pay GACC a $ 1 per ton royalty in calculating petitioners' consideration for the culm banks. We agree with petitioners. Assuming that Kaufman's *414 estimate of the coal production potential of these culm banks is correct, GACC would receive royalties of $ 134,000 in year 1, $ 267,000 per year in years 2 through 19, and $ 134,000 in year 20. Using an 18-percent discount factor, the present value to GACC of these amounts is $ 1,129,608.07. We believe the $ 1 per ton royalty reduces the value of the culm banks. Based on the multitudinous factors discussed above, we conclude that the fair market value of the culm banks was $ 7.25 million on June 26, 1975. 3. Innocent Spouse
Petitioners contend that Mrs. Durkin is an innocent spouse under section 6013(e). We disagree because Mrs. Durkin has failed to prove she meets the requirements of section 6013(e)(1)(B), (C), and (D). A husband and wife who file a joint return are jointly and severally liable for the tax due on their joint income. Sec. 6013(d)(3). The resulting joint and several liability also extends to any additions to tax. Sec. 6662(a)(2). However, a spouse may be relieved of joint and several liability in certain circumstances. Sec. 6013(e). To obtain relief as an innocent spouse, the taxpayer must prove that: (1) Joint returns were made for each year in *415 issue; (2) there is a substantial understatement of tax attributable to grossly erroneous items of the other spouse on each return; (3) the spouse desiring relief did not know, and had no reason to know, of such substantial understatement when signing the return; and (4) taking into account all facts and circumstances, it is inequitable to hold the spouse seeking relief liable for the deficiency attributable to such substantial understatement. Sec. 6013(e)(1). A taxpayer must prove compliance with each of these provisions. Purcell v. Commissioner, 826 F.2d 470, 473 (6th Cir. 1987), affg. 86 T.C. 228 (1986); Sonnenborn v. Commissioner, 57 T.C. 373, 381 (1971). However, we are mindful that in enacting section 6013(e) Congress "intended the exception to remedy a perceived injustice, and we should not hinder that praiseworthy intent by giving the exception an unduly narrow or restrictive reading." Sanders v. United States, 509 F.2d 162, 166-167 (5th Cir. 1975); accord Allen v. Commissioner, 514 F.2d 908, 915 (5th Cir. 1975), affg. in part and revg. in part 61 T.C. 125 (1973). *416 a. Joint Returns
Petitioners filed joint returns for the years in issue, thereby satisfying the requirements of section 6013(e)(1)(A). b. Understatement Attributable to Grossly Erroneous Item of the Other Spouse
Mrs. Durkin has failed to prove there was a substantial understatement attributable to grossly erroneous items of Mr. Durkin as required by section 6013(e)(1)(B). We are not persuaded that the substantial understatement is solely attributable to Mr. Durkin. Petitioners argue that Mr. Durkin and not Mrs. Durkin was the sole moving force behind the culm bank purchase; thus the understatement is not attributable to Mrs. Durkin. We disagree. Mrs. Durkin was extensively involved in petitioners' business activities. For example, she was a director, vice president, secretary, and treasurer of Barbara Coal; vice president, secretary, and director of Raymond Colliery Co.; vice president, secretary, and a director of Blue Coal; secretary and director of Truesdale; and she was an officer, director, and/or employee for Connell Coal Co., Dart Coal Co., Lyon Coal Co., Lark Coal Co., Almar Coal Co., and Great West Sales Co. Mrs. Durkin was also the sales manager of the *417 Durkin Enterprises operation where she was responsible for mining, stripping, hunting, timber and clay leases. We are not persuaded that the substantial understatements are due solely to Mr. Durkin. c. Knowledge of the Understatement
Petitioners must prove that Mrs. Durkin had no actual knowledge or reason to know of a substantial understatement when signing the return. Sec. 6013(e)(1)(C). She must show that a reasonably prudent person with her knowledge of the surrounding circumstances would not and should not have known of the omissions of income and overstated deductions and credits at the time of the signing of the return, keeping in mind her level of intelligence, education, and experience. Sanders v. United States, 509 F.2d 162, 166-168 (5th Cir. 1975). Mrs. Durkin argues that she had no actual knowledge of the understatement. She asserts that her husband involved her in deals that she knew nothing about, and that she trusted her husband. She denies knowing the value of culm banks. Mrs. Durkin minimizes her presence at the Blue Coal offices. She argues that the understatement was the result of complex transactions, and that she had no reason *418 to know something was wrong with the returns. We are not persuaded by these assertions. Mrs. Durkin had an extensive business background. She has a college degree in mathematics. She has attended accounting courses and law seminars. She has Pennsylvania real estate and insurance licenses, and she was extensively involved in the family coal businesses. Petitioners argue that there is no evidence that she was involved in the processing of the culm banks or aware of the value of the banks acquired in the June 26, 1975, transaction. Despite these denials, we conclude that she had actual knowledge of the culm bank transaction, and the sale of GACC stock, and that she knew generally of the value of the banks acquired and what was being given in consideration for them. Mrs. Durkin argues that she learned that the Carrier Coal Enterprises' venture was a disaster when she signed her 1975 return in August 1976. This position is not persuasive. Mrs. Durkin asks us to infer that Carrier Coal Enterprises' failure was caused by low culm bank values. We have rejected this argument. In addition, assuming for the sake of argument that by August 1976, the fair market value of the culm banks *419 had substantially decreased, the value on the return represented the value on the date of the transaction from which gain or loss is calculated. Accordingly, she would know of the understatement when she signed the return. d. Inequitable to Hold Spouse Seeking Relief Liable
To be eligible for innocent spouse status, Mrs. Durkin must show that it is inequitable to hold her liable for tax. Sec. 6013(e)(1)(D). Petitioners argue that Mrs. Durkin did not financially benefit from this transaction. We are not so persuaded. Petitioners point to their interest in Truesdale Enterprises, Inc., being sold at an alleged $ 4 million loss. Petitioners' interest in Truesdale Enterprises, Inc., has nothing to do with the tax result of the culm bank transaction. Petitioners also argue that Mrs. Durkin had everything she wanted before and after the culm bank transaction. They urge us to infer from that assertion that Mrs. Durkin did not benefit from the tax result of the culm bank transaction. We decline to do so. We conclude that it is not inequitable for Mrs. Durkin to be liable for the tax deficiencies at issue in this case. In light of the forgoing, we are not persuaded that Mrs. *420 Durkin is entitled to relief as an innocent spouse under section 6013(e). We again point out that this opinion resolves the culm bank valuation and innocent spouse issues only, and that the constructive dividend issue is still before the Court. Footnotes
*. After installation of new vessel.↩